**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jonathan MARTIN, Defendant–Appellant.**

No. 02–6009.

United States Court of Appeals, Sixth Circuit.

April 16, 2004.

---

Robert C. Watson, Robert Anderson, Asst. U.S. Attorney, U.S. Attorney's Office, Nashville, TN, for Plaintiff–Appellee.

Mariah A. Wooten, Hugh M. Mundy, Federal Public Defender's Office, Nashville, TN, for Defendant–Appellant.

* The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation.

1. Stewart believed the tickets were purchased with cash because he witnessed the man

Before MARTIN AND MOORE, Circuit Judges, and McKEAGUE,* District Judge.

## OPINION

McKEAGUE, District Judge.

Defendant–Appellant Jonathan Martin ("Martin") appeals the district court's denial of his motion to suppress statements and evidence seized by drug enforcement agents at the airport. For the following reasons, we **VACATE** the district court's order denying defendant's motion to suppress and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

On March 29, 2001, Rich Stewart ("Stewart") and Tim Hawn ("Hawn"), Drug Enforcement Administration Task Force Officers, were conducting surveillance at the Nashville International Airport. On that day, Agents Stewart and Hawn were monitoring the front counters of Southwest and American Airlines for last minute ticket purchases to "source cities" for possible narcotics trafficking.

At some time between 10:30 am and 11:30 am, Stewart observed an African–American man and an African–American woman standing in the Southwest ticket line. Though these two individuals distanced themselves from each other and did not speak to one another, Stewart thought the two appeared to be together. After watching each individual make a separate reservation at the counter, Stewart observed the man pay with cash for both tickets.[1] In addition, Stewart noted that the two individuals neither checked nor

reach into his front pocket to purchase the tickets. However, Stewart also testified during the suppression hearing that he never actually saw cash exchanged.

carried any luggage. As a result of what Stewart believed was a cash transaction and the behavior of the two individuals at the ticket counter, he became suspicious and relayed those suspicions to Hawn.

After the agents observed the two individuals exit the airport, Stewart approached the Southwest ticket counter and questioned the ticket agent about the two individuals. The ticket agent informed Stewart that two one-way tickets to Houston, Texas were purchased with cash under the names of Tiffanie Dickson and Anthony Taylor for a flight scheduled to depart between forty minutes to one and a half hours from the time the tickets were purchased.[2]

The agents, after speaking with the ticket agent, proceeded to Gate C–21, the departure gate for the Houston flight. Stewart notified the ticket agent at Gate C–21 that he was awaiting the arrival of Dickson and Taylor. Stewart and Hawn then positioned themselves at different locations to monitor the area.

Shortly thereafter, Hawn observed an African–American woman later identified as Lachelle Woods ("Woods"), and an African–American man later identified as Defendant–Appellant Martin approach Gate C–21. Hawn informed Stewart that while the two individuals did not resemble the two individuals who had made the ticket purchase at the Southwest counter, these two individuals also distanced themselves from one another though they appeared to be together. The two individuals approached the gate and checked in separately, while appearing to maintain an eye on each other. Hawn followed Woods to a nearby restaurant while Stewart sat near Martin in the Gate C–21 area.

Hawn, observing Woods, saw what he thought were bulges in the back of her pants when Woods' jacket shifted upwards as she received a food tray from the clerk at the restaurant counter.[3] Hawn then proceeded to inform Stewart that he believed that Woods was a "body packer," at which point, Stewart told Hawn that these two individuals had checked in under the names of Anthony Taylor and Tiffanie Dickson. Hawn approached Woods, displayed his credentials, and asked her if he could talk with her about her travel plans. As Hawn and Woods moved from where she was sitting to another part of the restaurant, Hawn contacted Stewart again and informed him that he believed Woods was a body packer.

After Hawn informed Stewart that he had a body packer and that Woods and Martin were traveling together, Stewart, identifying himself as a narcotics agent, initiated contact with Martin and asked if Martin would speak with him. While Martin initially stated that he did not mind speaking with Stewart, Martin refused to provide his name when asked by Stewart. Stewart then informed Martin that Stewart believed that he was traveling under a false name and asked Martin to produce his ticket. Martin again refused to comply with the request. Stewart repeated that he believed Martin was traveling under a

2. Stewart contends the flight was scheduled to depart approximately forty minutes after the tickets were purchased. However, Martin contends that the tickets were purchased one and half hours before the flight's scheduled departure. The district court declined to make a factual finding as to when the tickets were purchased, considering it unnecessary to the resolution of Martin's motion to suppress. We agree that in this instance the time of departure is not necessary to the resolution of Martin's motion to suppress.

3. During the suppression hearing, the district court judge observed a demonstration and determined it was unlikely that Hawn would have been able to observe bulges in Woods' pants.

false name. Martin again refused to respond and, according to Stewart, became loud and obnoxious.

Stewart then asked Martin to follow him to Gate C–20 so the two could talk. According to Stewart, Martin complied with the request and began walking, leaving his bag on the chair where he had been sitting. Stewart picked up Martin's bag and the two men walked in the direction of the gate. When Martin noticed that Stewart had Martin's bag, Martin became upset, complaining loudly to Stewart. Stewart informed Martin that if he continued to be loud, he would arrest him.

Martin, unsurprisingly, testified that events transpired differently. According to Martin, when he attempted to show Stewart identification, Stewart grabbed Martin's bag and began walking in the direction of Gate C–20. As a result, Martin followed Stewart to confront him about taking his bag without his permission. Upon entering the gate, Stewart threw or placed Martin's bag in a corner. Martin then attempted to call his attorney from his cellular phone but received a busy signal. As he was attempting to call his attorney a second time, Martin was instructed to put the phone away and did so.

After Stewart and Martin exchanged words, Martin was arrested for disorderly conduct[4] and advised of his *Miranda* rights. At this point, according to Martin, he attempted to call his attorney again on his cell phone but Stewart ordered him to end the call and put the phone away. When Martin refused and told Stewart he wished to contact his attorney, Stewart took the telephone away from Martin.

Stewart, however, testified that after he arrested Martin, Martin appeared to calm down and requested that the two move to a more secluded area.

Shortly thereafter, Stewart took Martin to the DEA office and read Martin his *Miranda* rights a second time. Martin waived his rights and admitted that he had a large sum of money in his possession, which was then seized by Stewart. In an interview with another agent, Martin confessed to having transported narcotics and illicit drug proceeds from Houston to Nashville since November of 1999.

Martin was indicted on April 12, 2001, on one count of unlawfully conspiring to distribute five kilograms or more of cocaine and one count of unlawfully possessing with the intent to distribute a quantity of 500 grams or more of cocaine. On May 3, 2001, Martin filed a motion to suppress any statements made by him as well as any evidence the agents had seized at the airport.[5] On June 15, 2001, the district court held a suppression hearing on the motion during which agents Stewart and Hawn and defendants Martin and Woods provided testimony.

The district court denied Martin's motion to suppress. In its opinion denying the motion to suppress, the district court noted the existence of conflicting testimony as to the encounter that occurred between Martin and Agent Stewart. However, the district court specifically noted that it did not find it necessary to provide two separate accounts of the encounter because the discrepancies were not material to the encounter. In those instances in which discrepancies existed, the district

---

4. Though Martin was arrested for disorderly conduct, he was never charged nor given a citation for disorderly conduct.

5. Martin's co-defendant, Woods, also filed a motion to suppress statements and evidence arising from her detention. The district court granted Woods' motion to suppress the evidence finding that the evidence and statements derived from Woods were as a result of an illegal arrest.

court simply provided both versions of the event but failed to make findings as to which version was more credible.

The district court found that Stewart's encounter with Martin, prior to the arrest, was a *Terry* stop, that is, an investigative detention, supported by reasonable suspicion. *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The district court also concluded that Stewart acted in accordance with *Terry,* by using investigative measures which were the least intrusive means available to confirm his suspicions of Martin's criminal conduct. Additionally, the district court found that the search of Martin's person following his arrest for disorderly conduct did not violate Martin's rights because the arrest was supported by probable cause. The district court failed to consider, however, Martin's Fifth Amendment claim, raised in his motion to suppress.

On April 10, 2002, Martin entered a conditional plea of guilty to one count of possession with intent to distribute cocaine, reserving the right to appeal the district court's denial of his motion to suppress. Subsequently, on July 26, 2002, the district court sentenced Martin to 120 months imprisonment followed by five years supervised release. Martin filed a timely notice of appeal.

In essence, Martin argues that his detention was not a consensual encounter but was instead a seizure for which the agent lacked reasonable suspicion. Martin further argues his Fifth Amendment right to counsel was violated when he invoked but was denied his right to counsel both after the commencement of custodial interrogation by Stewart and also after he was arrested for disorderly conduct. Martin contends that any statements and evidence obtained be suppressed, and his conviction be set aside and the case be remanded to the district court for further proceedings.

Because the district court failed to address or rule on Martin's Fifth Amendment claim, we **VACATE** the district court's order denying Martin's motion to suppress and **REMAND** for further proceedings consistent with this opinion.

## II. ANALYSIS

We review an appeal from the denial of a suppression motion in a bifurcated fashion. The district court's factual determinations are reviewed for clear error while legal conclusions are reviewed *de novo. United States v. Smith,* 263 F.3d 571, 581 (6th Cir.2001). Additionally, determination of whether reasonable suspicion justifying a *Terry* stop exists is a question of law, reviewed *de novo* on appeal. *Id.* at 581.

### A. MARTIN'S INITIAL DETENTION

Martin argues that his detention was an unconstitutional seizure under the Fourth Amendment because Stewart lacked reasonable suspicion for the *Terry* stop. The government contends that the initial encounter between Stewart and Martin was not a seizure but rather a consensual encounter. Accordingly, the government argues that Martin spoke voluntarily with Stewart. Alternatively, the government argues that the encounter was a *Terry* stop supported by reasonable suspicion as the district court found.

This court has explained the three types of permissible encounters between police and members of the public. *United States v. Avery,* 137 F.3d 343, 352 (6th Cir.1997). First is the consensual encounter, which may be initiated without an objective level of suspicion. Second is the investigative detention, which if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity. And third is the arrest which must be supported by

probable cause. *Id.* (internal citations omitted).

A seizure occurs only when an officer has by means of physical force or show of authority restrained the liberty of a citizen. *Terry,* 392 U.S. at 19 n. 16. Courts must consider whether, under the totality of the circumstances, a reasonable person in the suspect's position would feel free to terminate or walk away from the police encounter. *Northrop v. Trippett,* 265 F.3d 372, 380 (6th Cir.2001).

■ We agree with the district court's determination that a seizure occurred. As the district court noted, Stewart identified himself as a narcotics agent, questioned Martin about traveling with a false name, and at some point grabbed Martin's bag without Martin's permission, as he started walking away from Martin towards another gate. *United States v. Cooke,* upon which the government relies for its contention that the initial encounter between Stewart and Martin was simply consensual, is distinguishable from this case. 915 F.2d 250 (6th Cir.1990). In *Cooke,* the agents approached the defendant, asked if they could speak with him, asked him identifying information, and asked permission to search his luggage. *Id.* at 251.

Unlike the defendant in *Cooke,* Martin refused to answer the agent's questions. Though Martin did not attempt to walk away, Martin was faced with more incriminating questions than the defendant in *Cooke,* and Martin's bag was seized without his permission. Even if the initial encounter between Stewart and Martin began as a consensual encounter, just a few minutes later, when Stewart grabbed Martin's bag without his permission as the two started walking towards a different gate, the encounter quickly became an investigatory stop. Thus, like the district court, we conclude that a reasonable person in Martin's position would not feel free to walk away or terminate the police encounter.

■ Because we conclude that Martin was detained pursuant to a *Terry* stop, we must determine whether the agent possessed reasonable suspicion to justify a *Terry* stop. Under the Fourth Amendment, police officers have limited authority to detain individuals. "The right of the people to be secure in their persons ... against unreasonable ... seizures ... shall not be violated." U.S. Const. Amend. IV. In *Terry v. Ohio,* the Supreme Court explained that a police officer may not detain an individual unless the police officer has reasonable suspicion that the individual has committed a crime. 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Reasonable suspicion is based on the totality of the circumstances and requires "a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

Martin contends Stewart lacked reasonable suspicion to make an investigatory stop when neither the nature of the ticket purchase nor Martin's conduct when he proceeded through the concourse provided such suspicion. He relies on *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), to support his argument that Stewart lacked reasonable suspicion for the initial encounter. We are not persuaded that the facts in *Brown* are analogous to those in the instant case so as to support Martin's proposition.

In *Brown,* two police officers in a patrol car observed the defendant and another individual walking in an alley. *Id.* One of the officers then stopped the defendant and ask him identifying questions. When asked why he had stopped the defendant, the officer testified that the situation simply looked suspicious and the officers "had

never seen that subject in that area before." *Id.* at 49. The Supreme Court, in determining that the officer lacked reasonable suspicion to make the stop, focused on the fact that the police officer was unable to point to any facts supporting his conclusion that the situation in the alley looked suspicious. *Id.* at 51–52.

Unlike the officers in *Brown,* Stewart did not simply have a generalized suspicion before approaching defendant. Instead, prior to detaining Martin, Stewart had gathered the following information, as the district court found: (1) the agents had witnessed an African–American man and woman together at the Southwest ticket counter who were not talking to each other but appeared to be together; (2) neither individual had any luggage; (3) after purchasing the tickets, with what appeared to be cash, the agents observed the couple exit the airport; (4) Stewart confirmed that the couple had paid cash for two one-way tickets to Houston, a known "source city;" (5) the tickets were purchased under the names Anthony Taylor and Tiffanie Dickson; (6) though Woods and Martin were wearing different clothes than the couple who had purchased the tickets, the agents noticed that the two walked separately yet Woods appeared to look back at Martin; (7) Martin and Woods checked into the gate for Southwest's Houston flight under the names of Anthony Taylor and Tiffanie Dickson, the same names used by the individuals who had purchased the tickets earlier; and (8)Stewart had been told that Woods admitted to being a body packer and that she was traveling with Martin.

6. Martin does not argue that the detention and investigative methods used were unreasonable, and therefore did not satisfy the conditions of a *Terry* seizure. However, we note that the encounter prior to Martin's arrest took only a few minutes, including the time

Based on these factors, and considering the totality of the circumstances, particularly Stewart's suspicion that Martin might be traveling under a false name, we conclude that Stewart did have a "reasonable and articulable suspicion" that Martin was involved in criminal activity.[6] Thus, we agree that the record supports a finding of reasonable suspicion.

## B. THE MIRANDA ARGUMENT AND RIGHT TO COUNSEL

### 1. Custodial Interrogation and Right to Counsel Prior to Arrest

Martin additionally argues that though he was in custody after Stewart initiated questioning at gate C–21, Stewart failed to read him his *Miranda* warnings, as required. Additionally, Martin asserts that he invoked but was denied his right to counsel after Stewart began questioning him, notwithstanding Stewart's failure to read Martin his *Miranda* rights. This argument fails, despite the district court's failure to address this claim.

Martin first argues that he was subjected to custodial interrogation from the time Stewart initiated questioning at Gate C–21 and was thus entitled to a *Miranda* warning. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Martin appears to argue that any incriminating statements and evidence should be suppressed because they were poisonous fruits as a result of Stewart's failure to administer *Miranda* warnings during the initial investigatory detention and questioning prior to arrest.

■ However, we conclude that Martin was not in custody such that *Miranda*

Stewart and Martin walked to a different gate. We agree with the district court's conclusion that Stewart acted in accordance with *Terry* by using investigative methods which were the least intrusive means available to confirm his suspicions.

warnings were required. The obligation to administer a *Miranda* warning to a suspect arises only where an individual's freedom has been so restricted as to render him in custody. *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *United States v. Swanson,* 341 F.3d 524, 528 (6th Cir.2003).

To determine whether Martin was in custody, we look to the totality of the circumstances in order to assess how a reasonable man in the suspect's position would have understood the situation. *Swanson,* 341 F.3d at 528–29. As we have noted, "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* at 529 (internal citations omitted).

Several factors are considered in determining whether the detention and questioning constitutes custodial interrogation. These factors include: (1) whether a reasonable person in the suspect's position would feel free to leave; (2) the purpose of the questioning; (3) the length of the questioning; (4) whether the questioning was hostile or coercive; (5) other indicia of custody such as whether the suspect was informed that the questioning was voluntary or whether the suspect possessed unrestrained freedom of movement or whether the suspect acquiesced to the officers' requests to answer some questions. *United States v. Crossley,* 224 F.3d 847, 861 (6th Cir.2000).

The circumstances here do not give rise to custodial interrogation. Though Martin was not free to leave during the investigatory stop, the restraint was not to the degree associated with a formal arrest. Indeed, the nature of a *Terry* stop means that the detained individual is not free to leave, at least temporarily, yet that individual is not entitled to *Miranda* warnings. *Swanson,* 341 F.3d at 528, citing *Berkemer*

*v. McCarty,* 468 U.S. 420, 439–41, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

Neither the length nor the place of questioning weigh in favor of defining Martin's detention as custodial interrogation. Martin was in an airport terminal, a public area, and surrounded by other people. Even when Martin moved with the agent to a less crowded gate, there is no indication that Martin was in a confined space that would have added a substantially coercive element to the interrogation. *See California v. Beheler,* 463 U.S. 1121, 1126, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)(stating that detainee not in custody even though interview took place in police station where detainee went to the police station voluntarily); *Crossley,* 224 F.3d at 861–62 (holding that defendant was not subject to custodial interrogation even though defendant was questioned by FBI agents in a closed classroom).

Additionally, the entire detention took only a few minutes before Martin was arrested and read his rights. While Martin was not informed that he was free to leave, he was not handcuffed or restrained in any other manner. *Swanson,* 341 F.3d at 530. The agents never displayed any handguns or other weapons. Thus, because Martin was not in custody, he was not entitled to receive *Miranda* warnings.

■ Second, failure to administer the warnings, even if we were to assume Martin was subjected to custodial interrogation during the investigatory detention, did not result in any harm. Martin's only incriminating statements were made after he had been given *Miranda* warnings twice and had waived those warnings. To the extent that Martin's argument is based on a poisonous tree doctrine, the argument fails. The poisonous tree doctrine operates in a

limited fashion in the *Miranda* context.[7] *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Elstad,* the Supreme Court explained that errors made by officers when administering *Miranda* do not "breed the same irremediable consequences" as infringement of the Fifth Amendment itself. *Id.* at 309. Here, there is no concern about an earlier unwarned confession poisoning a later, warned confession. There is no evidence that Martin was coerced or made any involuntary statements at all. He was given his *Miranda* warnings twice, waived his rights, admitted he had a large sum of money in his possession and confessed to transporting narcotics and illicit drug proceeds. Thus, Martin's only statements were warned statements, which were voluntary and admissible.

█ Martin also argues that because he requested but was denied counsel during the investigatory detention, any evidence seized and incriminating statements made should be suppressed. Martin's argument rests on the proposition established in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), that once an accused invokes his right to counsel during custodial interrogation, that interrogation must cease until counsel is made available, unless the accused initiates further conversation with the police. *Edwards,* 451 U.S. at 484–85. However, because Martin failed to unambiguously invoke his right to counsel, the agents were not required to cease questioning him.[8]

A close reading of the testimony from the suppression hearing reveals that while Martin may have attempted to call his attorney from his cell phone during the initial detention, he did so without informing the agent that he was in fact attempting to contact his attorney. When Martin and the agent moved to a different gate, Martin attempted to call his attorney in Texas using his cell phone but the line was

---

**7.** While the Supreme Court's decision in *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) concluding that *Miranda* is constitutionally based may create doubt as to the Court's holding in *Elstad,* the Court in *Dickerson* appeared to maintain a distinction between unreasonable searches under the Fourth Amendment and unwarned interrogations under the Fifth Amendment.

**8.** Martin's claim may also fail for the additional independent reason that since Martin was not in custody for purposes of *Miranda* when he made his initial phone call to his attorney, *Edwards* does not apply. Though *Miranda* contains language that appears to imply that a defendant may invoke his right to counsel prior to or during interrogation, the Supreme Court has subsequently questioned this language. Compare *Miranda,* 384 U.S. at 473–74 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease") with *McNeil v. Wisconsin,* 501 U.S. 171, 182 n. 3, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)("We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation'"). A number of circuits have also held that *Miranda* rights may be invoked only when an individual is subjected to interrogation while in custody. *See, e.g., United States v. Vega–Figueroa,* 234 F.3d 744, 749 (1st Cir.2000)(stating that "In order for *Miranda* rights to be invoked, there must be (1)custody and (2)interrogation"); *Burket v. Angelone,* 208 F.3d 172, 197 (4th Cir.), *cert. denied,* 530 U.S. 1283, 120 S.Ct. 2761, 147 L.Ed.2d 1022 (2000)(holding that a defendant may not invoke the protections provided by Miranda when he was not in custody); *United States v. Wyatt,* 179 F.3d 532, 537 (7th Cir.1999)(stating that the Fifth Amendment right to counsel cannot be invoked when a suspect is not in custody). However, we need not determine in this case whether a defendant who is not subjected to custodial interrogation may invoke his *Miranda* rights. Assuming that an individual may invoke his *Miranda* rights prior to interrogation, Martin's claim still fails because he never invoked his right to counsel as explained above.

busy. Martin then ended the call, never even indicating whom he had been trying to call, and was told to put the phone away. As Martin's testimony reveals,

Q. After you hung up the phone call, is that when you told him you needed to talk to an attorneys?

A. I told him I needed to talk to an attorney after he picked-he asked me to show him my ID. I stood up to show him my ID. At this point that's when he grabbed my bag. And I asked him, why would you grab my bag. He's walking to C–20.

. . .

A. As soon as we got to C–20, he threw my bag in the corner. And I asked him why.

. . .

Q. You still had your cell phone?

A. Yes, ma'am. And at this point when he threw my bag, I proceeded to call my attorney in Texas.

. . .

Q. What happened?

A. The line was busy, so I hung it up and tried to recall it. At this point he said: You need to put that phone down.

Q. What did you do?

A. I put my phone down.

Suppression Hearing Tr. JA 167–169. Almost immediately after that, Martin was arrested for disorderly conduct. As this court has noted, the request for the assistance of counsel must be unambiguous and unequivocal. *United States v. Suarez*, 263 F.3d 468, 482 (6th Cir.2001)(citing *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). The evi-

dence does not show that Martin made *any* request for counsel prior to his formal arrest, much less an unambiguous and unequivocal request.[9] Because the record does not support Martin's contention that he requested counsel prior to his arrest, Martin's argument fails.

**2. Right to Counsel After Arrest**

Finally, Martin argues that he invoked his right to counsel after he had been arrested and read his *Miranda* warnings but was denied his right to counsel. Martin asserts that once he invoked his right to counsel at this stage, all questioning should have ceased until counsel was made available. *Edwards*, 451 U.S. at 484–85. Accordingly, Martin argues that once he invoked his right to counsel, any subsequent interrogation mandates suppression of statements made and any evidence seized.

■ As Martin's testimony revealed during the suppression hearing, after Stewart advised him of his rights, he attempted to place another call on his cell phone to his attorney but was told to put the phone away. Responding to the agent's command to put his phone away, Martin stated, "I don't think so. I do have a right to call my attorney." Suppression Hearing Tr. JA 172. At this point, as Martin testified, Stewart took his phone away. Suppression Hearing Tr. JA 171–172. Stewart's version of the events differs. According to Stewart, after he read Martin his rights, Martin never asked for a lawyer or mentioned anything about speaking with an attorney. Detention Hearing Tr. JA 58, 62.

**9.** The district court's various statements indicating that Martin testified that he informed Stewart he wished to speak with an attorney prior to his arrest are simply not borne out by the record. The record only reflects, from Martin's own testimony, that he attempted to

make calls to his attorney but was either unable to complete the call or received a busy signal. The record does not reflect that Martin told Stewart he wished to contact his attorney prior to his arrest.

In any case, soon after, Stewart took Martin to the DEA office and advised him of his *Miranda* rights again. Martin waived his rights and upon further questioning admitted he had a large sum of money in his possession. Stewart then removed U.S. currency in excess of $40,000 from Martin's person. Martin also confessed in an interview with another agent to transporting narcotics and illicit drug proceeds.

While Martin had raised this claim in his motion to suppress, the district court failed to make findings or issue a ruling. Because the record contains conflicting testimony and because it is not sufficiently developed to allow us to decide the issue, we remand to the district court to determine whether Martin did indeed invoke his right to counsel subsequent to his arrest. We also instruct the district court, if it finds that Martin invoked his right to counsel, to address Martin's contention that *Edwards* requires suppression of his statements and evidence.

For the reasons stated above, we **VACATE** the district court's denial of Martin's motion to suppress statements and evidence and **REMAND** for further proceedings consistent with this opinion.