RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0289P (6th Cir.)
File Name: 03a0289p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  *v.*

JASON ERIC SWANSON,
  *Defendant-Appellant.*

No. 01-1934

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-80890—Patrick J. Duggan, District Judge.

Argued: December 5, 2002

Decided and Filed: August 15, 2003

Before: BOGGS, SILER, and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Corbett E. O'Meara, O'MEARA & O'MEARA, Grosse Pointe Farms, Michigan, for Appellant. Carl D. Gilmer-Hill, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Corbett E. O'Meara, O'MEARA & O'MEARA, Grosse Pointe Farms, Michigan, for Appellant. Carl D. Gilmer-Hill, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

---

## OPINION

---

BOGGS, Circuit Judge. Jason Eric Swanson appeals his conviction for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). After a jury trial, Swanson was sentenced to 90 months of imprisonment. Swanson argues that the district court erred in failing to suppress two pieces of evidence: (1) the firearm that was the basis of his conviction, because it was the fruit of the unlawful seizure of his automobile; and (2) statements attributed to him, because they were elicited in violation of the *Miranda* rule. Swanson argues that the introduction of the firearm and the statements into evidence rendered his conviction unsound, and that the case should be remanded for a new trial. For the following reasons, we affirm Swanson's conviction.

### I

Swanson was prosecuted for possession of a firearm that was discovered in a white Pontiac Grand Am that was seized during the execution in Warren, Michigan, of an arrest warrant for Daniel Rick. Rick was suspected by federal agents of having trafficked in illegal firearms. Rick was seen driving the Grand Am on January 24 and 25, 1998 in the Detroit, Michigan area. The car is registered to Swanson's mother, Sherrie Swanson. On January 25, 1998, Rick was seen driving this vehicle in Effingham, Illinois, to and from a motel where he met with a cooperating witness.

During the meeting, Rick delivered a fully automatic firearm to the cooperating witness, and discussed with him additional transactions involving silencers and weapons. Between January 30 and February 25, 1998, Rick had telephone conversations with the cooperating witness in which they discussed the additional transactions. On

February 24, 1998, Rick received a Federal Express package from the cooperating witness that contained money to be used by Rick to buy silencers and automatic weapons.

Federal agents executed an arrest warrant, apparently obtained one or two days earlier, for Rick on February 26, 1998 at his workplace, the Marked for Life tattoo parlor.[1] Agents had been watching the shop and had confirmed Rick's presence. Special Agent Mark Davidson testified at the suppression hearing in Swanson's case that Rick had been seen arriving at work in the same Grand Am he had been seen driving to Illinois, although the car was driven by Swanson.

Due to the small size of the tattoo parlor, the law enforcement officers executing the arrest warrant for Rick ordered the seven or eight people inside the tattoo parlor to come outside so that Rick could be identified and arrested. The officers' weapons were drawn, but Special Agent William Fleming testified at the suppression hearing that the team members were holding their weapons down at their sides. The agents identified themselves to the group from the tattoo parlor, explained that they were executing an arrest warrant for Rick, and explained that the individuals aside from Rick would not be released until they were identified and the agents could verify there were no outstanding warrants for their arrest. The people from inside the shop were put up against the wall of the shop and frisked for weapons. They were ordered to produce identification. The agents identified Rick and arrested him. They also received permission from the owner of the tattoo parlor to search the inside. Agents then ran the names provided by the people through the Law Enforcement Information Network ("LEIN").

Swanson was among those who left the shop. He was approached by Agent Fleming and was interviewed while the

---

[1]The validity of the warrant is not at issue.

agents were identifying the people present and searching the shop. Fleming testified at the suppression hearing that had anyone attempted to walk away before being identified and cleared, the person would have been stopped. Swanson's name was still being run through the LEIN. The conversation took place outside, in public view, in an area on the north side of the shop.

Fleming testified that he advised Swanson that he was not under arrest and did not have to speak with him. He testified that Swanson said that he was willing to talk. Swanson then provided Fleming with background information, and told him that the Grand Am belonged to him. Fleming then asked Swanson whether there were guns or drugs in the car. Fleming's report indicated that Swanson answered, "I don't mess with drugs. Drugs are for niggers." Fleming pressed Swanson regarding whether there were guns in the car. Swanson answered that he didn't want to answer that question[2]. Fleming then reminded Swanson that he didn't have to answer any questions that he didn't want to. Fleming asked Swanson if there was anything in the car that would get him in trouble. Swanson replied yes. Fleming asked Swanson for consent to search the car. Swanson said, "If I talk to you I'm screwed." Swanson did not give consent to law enforcement officers to search the Grand Am.

After agents found that Swanson did not have any outstanding warrants, he was released. The agents seized the Grand Am, and in a subsequent search of the vehicle found a handgun in the front console between the front seats.

---

[2]Swanson's counsel asked several leading questions at this point suggesting that Swanson had indicated a desire not to answer any more questions. Fleming initially answered these questions in a manner that suggested that Swanson had indicated a desire for the questioning to stop, but, shortly thereafter, he testified that Swanson had only said that he didn't want to answer the question about drugs.

On May 10, 2000, a federal grand jury returned a one-count indictment against Swanson charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Swanson filed motions to suppress the statements and the firearm found in his car. After evidentiary hearings, the district court denied both motions. During Swanson's jury trial, the evidence regarding his statements and the weapon was introduced and admitted without objection. The jury found Swanson guilty on the sole count of the indictment. The district court sentenced Swanson to 90 months in prison, and a three-year term of supervised release. Swanson filed a timely notice of appeal.

## II

Swanson argues that the agents had no probable cause to seize the Grand Am, and that the introduction of the evidence of the firearm found in the vehicle violated his Fourth Amendment rights. He also argues that the statements introduced against him at trial were elicited in violation of his Fifth Amendment right against self-incrimination because he was in custody and received no *Miranda* warning.

### A.   The *Miranda* argument

Swanson argues that he was in custody at the time that he made his statements to Fleming and was thus entitled to a *Miranda* warning. He argues that the district court erred by denying his motion to suppress these statements. When reviewing suppression issues, we review a district court's factual findings for clear error, and its legal conclusions *de novo*. *United States v. Crossley*, 224 F.3d 847, 860 (6th Cir. 2000); *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir.), *cert. denied*, 523 U.S. 1122, 118 S. Ct. 1805 (1998). The question of whether a defendant was "in custody" is a mixed question of fact and law, and is thus reviewed *de novo*. *Salvo*, 133 F.3d at 948 (citing *Thompson v. Keohane*, 516 U.S. 99, 100-03, 116 S. Ct. 457, 460 (1995)).

A defendant may not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 1630 (1966) that a suspect subject to custodial interrogation must first be given notice of his or her right against self-incrimination. Statements obtained during custodial interrogation in violation of *Miranda* may not be admitted for certain purposes in a criminal trial. *Id.* at 479. However, the obligation to administer a *Miranda* warning to a suspect only arises "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977) (per curiam).

As Swanson does not challenge the validity of the investigatory stop that led to his questioning, we assume for the purposes of this appeal that the agents conducted a lawful detention of Swanson, analogous to a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). A *Terry* stop is a "'narrowly drawn' exception to the probable cause requirement of the Fourth Amendment." *United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991) (quoting *United States v. Sharpe*, 470 U.S. 675, 689, 105 S. Ct. 1568, 1577 (1985) (Marshall, J., concurring in the judgment)). An officer may stop a person upon reasonable suspicion of criminal activity. *Ibid.* "The officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the encounter provides the officer with probable cause to arrest him, he must then be released." *Ibid.* The very nature of a *Terry* stop means that a detainee is not free to leave during the investigation, yet is not entitled to *Miranda* rights. *Berkemer v. McCarty*, 468 U.S. 420, 439-41, 104 S. Ct. 3138, 3150-51 (1984). Therefore, the pertinent question is whether Swanson was "in custody" during the investigatory detention for the purposes of determining whether his Fifth Amendment rights were violated.

In determining whether a defendant was subject to custodial interrogation we look to the totality of the circumstances "to determine 'how a reasonable man in the suspect's position would have understood the situation.'" *Salvo*, 133 F.3d at 948 (quoting *United States v. Phillip*, 948 F.2d 241, 247 (6th Cir. 1991), *cert. denied*, 504 U.S. 930, 112 S. Ct. 1994 (1992)). The "ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983) (per curiam) (internal quotation marks omitted)).

After considering the totality of the circumstances of this investigatory detention, we conclude that Swanson was not subject to custodial interrogation. Although Swanson was not free to leave during the questioning, the restraint exercised never reached the level associated with "formal arrest or a coercive context tantamount to custody." *Salvo*, 133 F.3d at 953.

The first factor this court considers is whether a reasonable person in the defendant's position would feel free to leave. *Crossley*, 224 F.3d at 861. However, as noted above, in the context of a *Terry*-style investigatory detention, a person is not free to leave, at least temporarily. Thus, the first factor in the determination weighs in favor of defining Swanson's detention and questioning as a custodial interrogation. Other factors we take into consideration include:

(1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated

contact with the police . . . [or] acquiesced to their requests to answer some questions.

*Ibid.* (quoting *Salvo*, 133 F.3d at 950).

The place of the questioning was not hostile or coercive. The questioning took place outside, in a public space, with other agents and at least seven or eight other people from inside the shop nearby. The Supreme Court addressed detentions in public spaces in *Berkemer* in the context of detentions during traffic stops. *Berkemer*, 468 U.S. at 438-39, 104 S. Ct. at 3149-50. The Court noted that "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the [detainee's] fear that, if he does not cooperate, he will be subjected to abuse." *Id.* at 438, 104 S. Ct. at 3149.

The place of the questioning in the present case is substantially less hostile or coercive than in other cases in which this court or the Supreme Court has held that a detainee was not entitled to a *Miranda* warning. *See Beheler*, 463 U.S. at 1125-26, 103 S. Ct. at 3520 (detainee not "in custody" although questioning took place in a police station); *Mathiason*, 429 U.S. at 495-96, 97 S. Ct. at 714 (questioning at State Police offices behind closed doors not a custodial interrogation where defendant was informed he was not under arrest and was allowed to leave at the conclusion of the interview); *Mason v. Mitchell*, 320 F.3d 604, 632 (6th Cir. 2003) (defendant not in custody although transported to police station in police car as defendant voluntarily agreed to answer questions, was told he was free to leave, and was not under arrest during interview). Moreover, this case is analogous to *Salvo*, in which this court noted that the locations of defendant's interviews, his dormitory computer room and a Burger King parking lot, were not hostile or coercive environments. *Salvo*, 133 F.3d at 950-51.

Swanson also possessed unrestrained freedom of movement during the questioning by Fleming. While he was not free to leave until his name was cleared through the LEIN, he was not in handcuffs or in any other way restrained. Moreover, he was not arrested at the conclusion of the interview. While it is unclear from the testimony how long the questioning lasted, it is clear that the questioning only lasted as long as the time that it took to clear Swanson's name through the LEIN. It was not a prolonged interrogation, and Swanson was told that he would be free to leave as soon as his name was cleared.

Most important to our analysis, though, is that Swanson was explicitly told by Fleming that he was not under arrest and that he did not have so speak with him if he did not choose to. Swanson readily acquiesced, and seemed very cooperative and willing to talk. As noted in *Salvo*, a statement by a law enforcement officer to a suspect that he is not under arrest is an important part of the analysis of whether the suspect was "in custody." *Salvo*, 133 F.3d at 951 (suspect not in custody where he was advised he was not under arrest and was free to leave at any time); *see also Mathiason*, 429 U.S. at 495, 97 S. Ct. at 713-14 (defendant who was questioned at police station was not in custody where officer informed him that he was not under arrest and was free to leave at the end of the interview); *United States v. Sivils*, 960 F.2d 587, 598 (6th Cir. 1992) (defendant not in custody where he was informed before questioning that he was not under arrest); *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir.) (record would not support finding that defendants were in custody where told that they were not under arrest and were free to terminate questioning at any time), *cert. denied*, 498 U.S. 840, 111 S. Ct. 116 (1990).

Swanson argues that the facts in his case are analogous to the facts in *United States v. Jones*, 846 F.2d 358 (6th Cir. 1988). In *Jones*, the defendant was stopped by three police cars after the police received a call from a citizen who reported that he had witnessed a man place a long-barreled rifle or gun in the front seat of his car. *Id.* at 359. According

to the witness, the man appeared to be angry or was arguing with his female companion. *Ibid.* The witness gave the police a description of the car and a license plate number. *Ibid.* One unmarked and two marked police cars, all with lights flashing, stopped Jones in a way that his car was physically prevented from leaving the scene. *Ibid.* During the brief encounter with the police, Jones, a convicted felon, admitted that he had a gun back at his apartment. *Ibid.* He then followed the police back to his apartment in his own car. *Id.* at 360. After a policeman looked for the gun in the apartment and could not find it, Jones showed them where it was and he was arrested. *Ibid.*

The issue on appeal in *Jones* was whether Jones gave voluntary consent to the search of his apartment. The court held that he did not. *Id.* at 362. It also held, unnecessarily, that Jones was in custody when questioned and brought back to his apartment, because the police had deprived Jones of his "freedom of action" in a "significant way." *Id.* at 361. First, this holding might be considered dicta in that it was not necessary to the determination of the issue on appeal. Second, a bare conclusion that Jones was in custody because he had been deprived of his "freedom of action" in a "significant way" would be in direct contradiction to the Supreme Court's holding in *Berkemer*. In *Berkemer*, the Court held that a motorist temporarily detained in a traffic stop does not have the right to a *Miranda* warning even though a "traffic stop significantly curtails the 'freedom of action' of the driver . . . ." *Berkemer*, 468 U.S. at 436, 441, 104 S. Ct. at 3148, 3150.

Therefore, the court in *Jones* must have concluded that the stop at issue was something more than the routine traffic stop addressed in *Berkemer*. Indeed, a routine traffic stop does not usually involve three police cars blocking the stopped vehicle. In comparing *Jones* to the present case, however, it is clear that there are significant differences. In *Jones*, the questioning took place in a coercive atmosphere because Jones was surrounded by three police cars with lights

flashing. There is also no indication that he was told that the questioning was voluntary, or that he would be free to leave at the end of it, although he was told that he did not have to let the police officers search his car. Contrary to Swanson's assertion, the test for whether a person is in custody for *Miranda* purposes is not simply whether a reasonable person would have felt free to leave in the circumstances surrounding the interrogation. Although the "felt free to leave" inquiry may be a factor for consideration, *see Crossley*, 224 F.3d at 861; *Salvo*, 133 F.3d at 949-50, the "ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Knox*, 839 F.2d at 291 (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983) (per curiam) (internal quotation marks omitted)).

The court in *Jones* concluded that based on the totality of the circumstances, there was "a restraint of movement of the degree associated with formal arrest." In reviewing the totality of the circumstances, we conclude that Swanson was not in custody for *Miranda* purposes, and that the district court did not err when it denied the motion to suppress his statements.

## B. The Fourth Amendment argument

Swanson argues that the seizure of his car was without any legal justification, as the agents did not have probable cause. He argues that at the time of the seizure, the agents did not have any information that Rick (the target of the agents' arrest warrant) had been in the car for over a month, and had no information that there was evidence of a crime inside the car.

We review the district court's decision on Swanson's motion to suppress under "two complementary standards. First, the district court's findings of fact are upheld unless clearly erroneous. Second, the court's legal conclusion as to the existence of probable cause is reviewed de novo." *United*

*States v. Leake*, 998 F.2d 1359, 1362 (6th Cir. 1993) (citations omitted).

A warrantless seizure of an automobile is reasonable if there is "probable cause that an automobile contains evidence or fruits of a crime plus 'exigent circumstances.'" *United States v. Beck*, 511 F.2d 997, 1001 (6th Cir. 1975). The government urges us to hold that the "automobile exception" to the warrant requirement justified the seizure and subsequent search of Swanson's car. However, the question requires more than a mere invocation of the automobile exception. The Supreme Court in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022 (1971), stated that "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Id.* at 461, 91 S. Ct. at 2035. The Court in *Coolidge* distinguished between the seizure of an automobile parked in the defendant's driveway and one that the police have stopped and is readily mobile. *Id.* at 461 n.8, 91 S. Ct. at 2036.

The Supreme Court's holding in *Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280 (1925), extended only to warrantless searches of automobiles where the searching officer had probable cause and the car was stopped on the highway. *Id.* at 156, 45 S. Ct. at 286. In *Chambers v. Maroney*, 399 U.S. 42, 90 S. Ct. 1975 (1970), the Court held that if a warrantless search is justified under *Carroll*, the police may seize the car and search it at the station house without a warrant. *Id.* at 52. In *Coolidge*, the Court stated that the automobile exception to the warrant requirement extended only to circumstances in which "it is not practicable to secure a warrant." *Coolidge*, 403 U.S. at 462, 91 S. Ct. at 2036 (quoting *Carroll*, 267 U.S. at 153, 45 S. Ct. at 285). It held that *Carroll* would not have justified a warrantless search of Coolidge's car at the time of his arrest, and thus, the subsequent search at the station house was also illegal. *Id.* at 463, 91 S. Ct. at 2036.

The reasons the Court ultimately concluded that a warrantless search of Coolidge's car would not have been justified by the automobile exception are instructive in the analysis of the present case. The Court stated that what distinguished the seizure of Coolidge's car from the search in *Carroll* was that there was "no alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile." *Id.* at 462, 91 S. Ct. at 2036. The police knew where the car was regularly parked, they arrested Coolidge and escorted his wife to another location, had the premises guarded by two policemen throughout the night, and the evidence seized consisted of vacuum sweepings. *Id.* at 448, 460-61, 91 S. Ct. at 2028, 2035. The Court assumed the police had probable cause for the purposes of delineating the automobile exception. *Id.* at 458, 91 S. Ct. at 2034.

We conclude that the agents had both probable cause and justification for seizing and searching Swanson's automobile without a warrant. First, the agents had probable cause to seize and search the vehicle. Rick had used the Grand Am to deliver an automatic weapon thirty days earlier to a confidential informant; thus the vehicle was used as an instrumentality of the crime. The agents also had ample facts at their disposal to support their belief that there was further evidence of a crime inside the car. Only two days earlier, Rick had received a Federal Express package from the confidential informant containing money as payment for automatic weapons and silencers that Rick was to deliver by United Parcel Service. The agents had seen Rick arrive for work at the tattoo parlor in the Grand Am that day. When they searched the tattoo parlor, the empty Federal Express package was found in the trash. They also found three handguns, but not any automatic weapons that might be the ones that were to be delivered to the confidential informant. Moreover, the agents had just spoken with Swanson. Swanson had given evasive answers only to questions about

guns. When asked if there was anything in the car that could get him into trouble, he replied yes. There was "a fair probability that contraband or evidence of a crime" would be found inside the automobile. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983).

There were also exigent circumstances that justified the warrantless seizure and search. The Supreme Court has noted that "[t]he mobility of automobiles, . . . creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible." *California v. Carney*, 471 U.S. 386, 391, 105 S. Ct. 2066, 2069 (1985) (internal quotation marks omitted). In this case, the agents were not arresting Swanson. He would have been free to drive the car away, and perhaps destroy or dispose of evidence, or even the car itself. The evidence they believed they would find in the car was contraband or weapons. *See Coolidge*, 403 U.S. at 460, 91 S. Ct. at 2035 (distinguishing the objects the police expected to find in the automobile from objects that are "stolen [or] contraband [or] dangerous"). Indeed, the agents could have guarded both Swanson and the car until a warrant could be obtained. However, that is no less of an intrusion than the seizure and subsequent search of the car. *See Chambers*, 399 U.S. at 51-52, 90 S. Ct. at 1981.

While it is true that the agents had known for some time the role the Grand Am played in their investigation of Rick, from a review of the testimony at the suppression hearing, it appears that the warrant to arrest Rick issued only one or two days before it was executed and the automobile seized. Moreover, the package containing the purchase money had arrived only two days before the execution of the warrant. As the agents testified, it was the belief that this money or the automatic weapons Rick was selling would be in the car that formed the basis of their probable cause to seize it.

The agents would have been justified in searching the car at the scene according to *Carroll*. Therefore, they were justified in seizing the car and searching it at a later time.

*Chambers*, 399 U.S. at 51-52, 90 S. Ct. at 1981; *Autoworld Specialty Cars, Inc. v. United States*, 815 F.2d 385, 389 (6th Cir. 1987) (upholding the warrantless seizure of cars out of a showroom because the officers had probable cause and because of the inherent mobility of cars); *see also United States v. Graham*, 275 F.3d 490, 511 (6th Cir.) (affirming district court's denial of motion to suppress evidence recovered from a pickup truck because the agent had probable cause to search the truck and the inherent mobility of the truck), *cert. denied*, 535 U.S. 1026 (2001).

## III.

For the foregoing reasons, we AFFIRM Swanson's conviction.