File Name:  06a0658n.06
Filed:  August 29, 2006
NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

No. 05-4091

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff/Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| IAN FLORES, | ) | |
| | ) | |
| Defendant/Appellant. | ) | |

Before:      MARTIN and SUTTON, Circuit Judges; JORDAN, District Judge.[*]

LEON JORDAN, District Judge.  This appeal arises from the denial of Ian Flores's motion to suppress a gun found in his residence and the statements he made concerning the ownership of the gun.  For the reasons that follow, we **AFFIRM** the district court.

I.

Ian Flores was indicted on June 30, 2004, on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  Flores filed a motion to

_____

[*] The Honorable R. Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

suppress seeking to suppress the gun found in his home by officers who were searching for a fugitive and also to suppress the statements he made concerning ownership of the gun. The district court held an evidentiary hearing and ultimately denied the motion to suppress in its entirety.

On May 20, 2005, Flores entered a conditional plea of guilty, pursuant to a plea agreement that specifically preserved the right to appeal denial of the motion to suppress. After sentencing, Flores brought this appeal for the denial of the motion.

II.

Sometime around 8:00 or 9:00 on the morning of April 22, 2004, members of the U.S. Marshals Task Force and police officers from the Lorain Police Department were looking for a murder suspect named Anthony Villa, who had been involved in a homicide at a Lorain tavern. The officers had received information that Flores was a close associate of Villa's, so they went to Flores's residence looking for Villa.[1] Once at the residence, the officers knocked and announced their presence, and Flores opened the door and invited them in.

Detective Cory Earl of the Lorain Police Department told Flores that they needed to interview him and look in the house to see if Villa and his sister, also a fugitive,

---

[1] Flores testified at the suppression hearing that Villa is his first cousin.

were hiding there. Flores said that he was not surprised that the officers had come to his house looking for Villa. Detective Earl asked Flores for verbal consent to search the house to see if Villa was hiding there.

Flores testified at the suppression hearing that he consented to a fugitive search of his house. He also testified that none of the officers said anything that was intimidating, coercive, or threatening in order to obtain entrance to his home or to conduct the search. Flores admitted that he did not limit the areas where the search could be conducted and that he did not at any time during the search withdraw his consent, challenge the search, or ask the officers to leave.

However, there was a factual dispute at the suppression hearing concerning the location of the gun when it was found. Sergeant Christopher Pittak of the Lorain Police Department testified that he searched the master bedroom on the second floor of the house. According to him, the bed was not made, and he lifted a comforter to look under the bed. When he did so, he saw a gun that turned out to be a loaded .45 Caliber Lama semi-automatic pistol. Sergeant Pittak unloaded the gun and gave it to Detective Earl who then went into an upstairs room used as an office where Dana Weigand, Flores's girlfriend, was being questioned by one of the marshals. Weigand and her four-year old daughter were living with Flores.

Detective Earl asked Weigand if there were any weapons in the house, and she said there were not. When he showed her the gun and asked if it was hers, she denied owning it. However, at the suppression hearing, Weigand admitted that she lied to Detective Earl because she did in fact know that the gun was in the house. She also testified that from her position in the office she could see into the bedroom and she saw the officer take the gun from under the mattress, not from under the bed. Also at the suppression hearing, several pictures of the bed were introduced through Weigand, one of which shows the bed being six inches off the floor.

After talking with Weigand, Detective Earl put the gun in the back of his pants and went downstairs to the living room where Flores was sitting. According to Detective Earl, when he showed the gun to Flores and asked if it was his, Flores said it was and spontaneously said, "You found it underneath the bed." Flores then talked about living in a bad neighborhood and needing the gun for protection. At the suppression hearing, Flores testified that when Detective Earl came downstairs and asked him if he had any firearms, he told him he did not. However, when Detective Earl pulled the gun from behind him and asked if it was his, Flores said, "Yeah, you found that under my mattress." Flores said that the gun was kept under the mattress because his children came to the house to visit and Weigand's daughter lived with them.

The statements made by Flores to Detective Earl were made while Flores was

sitting on his couch in the living room, where prior to that time, Flores had been talking with Deputy U.S. Marshal Herbert. It is undisputed that Flores was not given a *Miranda* warning and that he was not handcuffed or detained. Flores admitted on cross examination that he was told he would not be arrested that day. At one point prior to Detective Earl's questioning about the gun, Flores escorted Detective Earl to the garage. Detective Earl had asked Flores if he could search his truck and the garage, and Flores agreed. According to Detective Earl's testimony, Flores walked outside, opened the car and the garage, and then went back inside and sat down again in the living room.

Prior to being presented with the gun, Flores was asked if he was a felon. He admitted that he was. Flores has in fact been convicted three times for drug trafficking offenses and has spent time in prison for each offense. At the suppression hearing, Detective Earl testified that he was familiar with Flores and his criminal background before the murder investigation started. Flores testified that he knew Detective Earl as a member of the Lorain Police force. The officers left Flores's residence with the gun, but before departing they told Flores that he might receive some consideration regarding the firearms charge if he assisted in locating Villa. Flores was not arrested until July 7, 2004.

III.

The district court denied the motion to suppress in its entirety. The court noted

that Flores did not dispute that he voluntarily consented to allowing the officers into his home to search for Villa. Therefore, the only dispute involved the location of the gun when it was found and whether the officers exceeded the scope of the consent by looking under the mattress or under the bed in the course of the search.

The district court determined that the scope of Flores's consent extended to permitting the officers to look under the bed, but looking under the mattress would have exceeded the scope of the consent. The court found that according to the police the gun was in plain view under the bed, and since the officers knew that Flores was a convicted felon, the criminal nature of the gun was immediately apparent to the officers.

As to the dispute over where the gun was located, the district court found Sergeant Pittak to be more credible. The court reasoned that the purpose for being in Flores's home was to search for Villa; Flores was not under suspicion of a crime nor did the officers have any reason to suspect him of a crime. Therefore, the officers had no motivation to look under the mattress. On the other hand, the district court reasoned that Flores was a three-time convicted felon who had an interest in not going back to prison and therefore had a motive to lie about the gun's location. Flores in fact lied to the officers when he was asked if he had any firearms. Weigand admitted on the stand that she lied to the police about whether there were any guns in the house. The district court ultimately determined that the gun was under the bed when it was found by Sergeant Pittak, and accordingly the search was valid.

As to whether Flores should have been given a *Miranda* warning before being

questioned about the gun, the district court looked to the totality of the circumstances and concluded that Flores was not in custody when he was questioned because there was no deprivation of his freedom in any substantial way.  Therefore, the district court determined that the officers were under no constitutional obligation to read Flores his *Miranda* rights.

IV.

When reviewing a district court's decision concerning a motion to suppress evidence, this court reviews the district court's factual findings for clear error and the legal conclusions *de novo*.  *See, e.g., United States v. Crozier*, 259 F.3d 503, 510 (6th Cir. 2001). "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999).  In this court's review of the district court's findings of fact, the evidence is considered in the light most favorable to the government.  *United States v. Buchanon,* 72 F.3d 1217, 1223 (6th Cir. 1995).  In addition, when "factual findings rest in large part on credibility determinations, we afford district courts even greater deference." *Navaro-Comacho*, 186 F.3d at 707.

V.

The district court determined that based on his own testimony Flores voluntarily consented to the officers searching his home for Villa. Therefore, the court found that the scope of the search extended to allowing the officers to look under the bed but not underneath the mattress. The district court credited the testimony of Sergeant Pittak over that of Flores and Weigand and found that the gun was located under the bed when it was discovered. The district court went on to hold that the gun was in plain view and properly seized by the officers.

Flores appears to some extent to raise an argument about the voluntariness of the search. Flores also argues that the officers exceeded the scope of his consent when they looked under the bed and that because the bed was just six inches off the floor, no one could have been hiding under it. Flores further contends that the gun was not properly seized under the "plain view" doctrine as the criminal nature of the gun was not immediately apparent to Sergeant Pittak, because at the time he found the gun Sergeant Pittak did not personally know Flores was a convicted felon.

The government argues that Flores has waived any challenge to the voluntariness of the search; that consent to a fugitive search allowed the officers to look under the bed; and that Flores has waived any challenge to the plain view seizure of the gun.

*Voluntariness of Consent*

To the extent Flores raises on appeal the voluntary nature of his consent, that issue has been waived. "Waiver is the 'intentional relinquishment or abandonment of a known right,' and these rights are not reviewable." *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002) (citing *United States v. Olano*, 507 U.S. 725, 732-33 (1993)). Although Flores raised the issue initially in his motion to suppress, his testimony and statements by his counsel at the suppression hearing demonstrate that the issue was abandoned.

Flores's own testimony at the hearing demonstrates that he voluntarily consented to allow the officers into his home and to search for Villa. He testified as follows:

Q.     Now, you have indicated that you allowed the officers into your home to search for Anthony Villa, is that correct?

A.     Yes.

Q.     Did you in any way limit the areas where they could search?

A.     No, I didn't.

Q.     Did you tell them you can't go into my bedroom?

A.     No, I didn't.

Q.     And is that where you kept the firearm?

A.     Yes.

Q.     So you never told them that they couldn't go into your bedroom, although you knew it was there.

A.    Yes.

Q.    At any point while the officers were searching, did you ever withdraw consent to search any portion of that residence?

A.    No, I didn't.

In addition, on direct questioning Flores stated, "they asked me if they could come in and see if he (Villa) was there and I invited them in." Also on direct examination, Flores was asked by his counsel, "And it's your testimony that you consented to letting them do a fugitive search of your house, correct?" Flores answered, "Yes."

Statements by his trial counsel at the hearing also further demonstrate that Flores had abandoned the issue of whether he voluntarily admitted the officers and permitted the search. "An attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course." *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990). The following exchange occurred between defense counsel [2] and the district court:

> **The Court**:   Is he contesting that there was any consent at all, or is he saying that he didn't consent to the extent that they searched his house? Which one is it?
>
> **Counsel**:     We're not contesting that fact that he consented, I think it's apparent that there was consent, he cooperated.
>
> . . . .

---

[2] Flores's present counsel did not represent him at the suppression hearing.

> **The Court**:   I also would like you to, both sides asked, so it is fair to allow you some follow-up, but I thought that there was an agreement that he consented to have them come in and do a search for Mr. Villa, so I'm not sure why we are spending the time on how he felt [when the officers inquired about searching for Villa in his home].
>
> **Counsel**:   I have no further questions, then.  Thank you, Your Honor.
>
> **The Court**:   If that's important to your case —
>
> **Counsel**:   No, it is not.

Further, in his motion for reconsideration, Flores did not challenge the portion of the district court's order that states, "Flores does not dispute that he voluntarily consented to letting the police search his home for Villa."  The record reveals that Flores has waived any issue concerning the voluntariness of his consent to the fugitive search of his residence.[3]

### *Scope of the Search*

The district court made the factual finding that the gun was found under the bed.  Flores does not challenge that factual finding, and there is nothing in the record to suggest that this finding by the district court was clearly erroneous.  We then must determine whether the scope of the search to which Flores consented would include looking under the bed and whether Sergeant Pittak lawfully seized the gun when he saw it under the bed.

---

[3] Even if the issue of voluntariness had not been waived, there is no proof in the record that Flores's consent was anything other than knowing and voluntary.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect[.]" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citations omitted). Flores consented to a fugitive search; thus, it would be reasonable for the officers to look in places where a person could hide. In the context of a protective sweep, the Supreme Court has stated that such a search "may extend only to a cursory inspection of those spaces where a person may be found." *Maryland v. Buie*, 494 U.S. 325, 335 (1990) (footnote omitted).

The district court relied on *United States v. Bass*, 315 F.3d 561 (6th Cir. 2002) and *United States v. Meredith*, Nos. 96-5990, 96-5991, 1997 WL 73265 (6th Cir. Feb. 19, 1997) in support of its position that it was reasonable for the police officers to look in closets and under beds when searching for Villa. These cases involved the scope of a search during a protective sweep and the suppression of evidence found during the sweep. In both cases, this court determined that it was permissible to look under a bed as part of a limited search of places where a person could hide.

Flores attempts to distinguish these cases by arguing that they involved protective sweeps and not a search like the one at issue in this appeal. The distinction, however, lacks merit. A protective sweep, like the search conducted in Flores's home, involves looking for people. Like the search at issue here, a protective sweep is not a full search but is limited to those areas where a person could hide. Such areas certainly include

closets and under beds. In addition, Detective Earl and Sergeant Pittak both testified that in their experience as law enforcement officers they had found people hiding under beds numerous times.

Flores also argues that the bed was only six inches off the floor, so a person could not have hidden under it. Pictures reflecting this fact were introduced at the suppression hearing through Weigand. The district's court order does not address this proof. Nevertheless, this evidence does not render the search unreasonable.

There is no dispute that the bed was elevated off the floor. At the time of the search, the bed was unmade. Sergeant Pittak testified that he could not determine if anyone was under the bed until he lifted the comforter and looked underneath it. Once he did, he saw the gun. An officer searching for a fugitive under a bed should not have to first measure how far the bed is off the floor and then determine whether a person could fit under it before actually looking.

We conclude that a reasonable person would understand that permitting police officers to search his or her home for a fugitive would mean permitting the officers to look under beds, because these are places where a person could hide. Flores's argument that he did not think the search of his house would go to that extent is not objectively reasonable. The search in this case, which included looking under the bed, was constitutionally permissible.

*Plain View Exception*

Finally, we consider whether the gun was properly seized by Sergeant Pittak once he saw it. The district court determined that the gun was in plain view under the bed and since the officers knew Flores was a convicted felon, the criminal nature of the gun was immediately apparent. Flores argues that the incriminating nature of the gun was not immediately apparent so the plain-view seizure of the gun was not justified.

The government contends that Flores has waived this argument on appeal because in his suppression motion he took the position that "a gun's incriminating character is arguably immediately apparent." Flores argued to the district court that the officers did not have a warrant so they were not legally in the house and that they had no legal right of access to the gun because it was under the mattress.

"This court has held that 'a defendant who fails to raise a specific issue as the basis for suppression has waived the right to raise that issue on appeal.'" *United States v. Burton*, 334 F.3d 514, 516 (6th Cir. 2003) (quoting *United States v. Critton*, 43 F.3d 1089, 1093 (6th Cir. 1995)). Arguably, Flores has waived this specific issue.

However, even if Flores has not waived this issue, the gun was properly seized under the plain view doctrine.

> Under ordinary circumstances, the plain view exception permits
> the warrantless seizure of an object provided that (1) the officer
> is lawfully positioned in a place from which the object can be

> plainly viewed; (2) the incriminating character of the object is immediately apparent; and, (3) the officer has a lawful right of access to the object itself.

*United States v. Bishop*, 338 F.3d 623, 626 (6th Cir. 2003) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)). Sergeant Pittak, the officer who found the gun, was acting pursuant to a consensual search, and based on the scope of that search he had the lawful right to look under the bed. The district court found and the government primarily argues that the officers knew Flores was a convicted felon who could not lawfully possess a firearm. Therefore, the criminal nature of the gun was immediately apparent to the officers, and the plain view exception applies, making seizure of the gun appropriate.

However, the government also argues that even if the criminal nature of the gun was not immediately apparent, the officers could temporarily seize the gun for safety reasons. "The Supreme Court also has indicated that the plain view exception permits the warrantless seizure of 'objects dangerous in themselves.'" *Bishop*, 338 F.3d at 626 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 472 (1971)). This court has held "that a police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety." *Bishop*, 38 F.3d at 628.

The officers in this case were looking for a murder suspect, and the search of the house had not been completed. Weigand's four-year-old daughter was asleep in the house at the time the search was on going. Under the circumstances, Sergeant Pittak was

justified in seizing the gun at least temporarily. After unloading the gun, he gave it to Detective Earl. Although Sergeant Pittak did not personally know Flores was a convicted felon, Detective Earl did have that knowledge and therefore knew that Flores could not possess a firearm. The knowledge that Flores was a convicted felon gave the officers the right to permanently seize the gun. *United States v. Frederick,* 152 F. App'x 470, 473 (6th Cir. 2005) ("[T]he officers permissibly seized the rifle temporarily. What the officers learned after taking control of the weapon – that Frederick owned it and that he was a convicted felon – gave them authority to seize the weapon permanently."). For these reasons, we conclude that the gun was properly seized.

VI.

The district court concluded that Flores was not subject to custodial interrogation when he spoke with the officers. Therefore, the police had no constitutional obligation to read Flores his *Miranda* rights.

Flores argues that he was in custody and/or under arrest at the time the police surrounded his house before the six officers entered his home. He also argues that all of the officers were carrying firearms and were wearing body armor, and he was "effectively seized" when the officers were in his home. Although officers were positioned outside the Flores residence in the event Villa was present and tried to flee, there is no proof that their

presence was part of any show of force by the officers

The government argues that the district court correctly found that Flores was not in custody when he made the incriminating statements about the gun. The government further contends that an analysis of the totality of the circumstances surrounding the questioning of Flores ultimately demonstrates that he was not in custody and not entitled to a *Miranda* warning.

The issue of whether Flores was "in custody" is a mixed question of law and fact, and it is reviewed *de novo*. *United States v. Swanson*, 341 F.3d 524,528 (6th Cir. 2003) (citing *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998)). In *Swanson*, this court set out the factors to be considered when determining whether a person was subject to custodial interrogation. We stated:

> The first factor this court considers is whether a reasonable person in the defendant's position would feel free to leave. . . . Other factors we take into consideration include: (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police . . . [or] acquiesced to their requests to answer some questions.

*Swanson*, 341 F.3d at 529 (citation omitted). This court also concluded in *Swanson* that

> the test for whether a person is in custody for *Miranda* purposes is not simply whether a reasonable person would have felt free

> to leave in the circumstances surrounding the interrogation. Although the "felt free to leave" inquiry may be a factor for consideration, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Id.* at 531(internal quotations and citations omitted).

The totality of the circumstances in this case demonstrate that Flores was not in custody when questioned by the officers. The questioning occurred in Flores's home after he had voluntarily consented to the officers entering his residence to look for Villa. The officers were not present to investigate Flores or because they suspected him of committing a crime. Flores was not handcuffed, confined, or restrained; he sat on the living room sofa, and according to Detective Earl they had a "casual conversation." At one point, Flores took Detective Earl to the garage and then returned to the living room. There is no indication that his movements were restricted. The officers were in the house for only about thirty minutes, and there is no testimony or showing that the officers surrounded Flores during the questioning. In addition, Flores was told that he would not be arrested that day. All of these factors indicate that Flores was not subjected to custodial interrogation and not deprived of his freedom in any substantial way. Therefore no Miranda warning was required.

For the foregoing reasons, we **AFFIRM** the district.