NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0553n.06

No. 17-3111

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 02, 2018
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| JOHNATHAN HOLT, | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellant. | ) | |

Before: BATCHELDER, MOORE, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Johnathan Holt assisted the Short North Posse by acting as an aggressor in robberies organized by one of the gang's members. During one such robbery, Holt shot a man, who later died from his injuries. A jury convicted Holt of murder in aid of racketeering, 18 U.S.C. § 1959(a)(1), and murder with a firearm during a drug trafficking crime, 18 U.S.C. § 924(j). Holt brings two claims on appeal: (1) the district court erred by denying his motion to suppress statements he made during an interview with a prosecutor and law enforcement officers; and (2) the jury heard insufficient evidence to convict him of murder in aid of racketeering. We AFFIRM Holt's convictions.

I.

The Short North Posse operated in Columbus, Ohio. Although selling drugs in the Short North neighborhood was the gang's "primary income[-]producing venture," gang members also engaged in robberies outside of the neighborhood to "[e]nrich[] its members and associates" and often recruited associates from outside of the gang to help. Lance Reynolds was a gang member

and the "orchestrator" of a series of robberies targeting drug dealers. He relied on associates from other neighborhoods, including defendant Holt, who was not a gang member, to help him carry out these robberies. Beginning around 2009, Holt served as Reynolds's "aggressor" during robberies, meaning he would be the one to "run up on you, shoot you or stick you up."

Some of the individuals who had participated in these robberies with Reynolds and Holt testified at trial. Christopher Wharton testified that he had become involved in the robberies through his friendship with Holt. Wharton explained that he had "wanted some money," that he had known that Reynolds was a member of the Short North Posse, and that he had wanted to get in on Reynolds's plans because "everybody knows they rob people." Wharton testified that Holt had rebuffed his attempt to join a robbery of a Check Into Cash store, but that Holt had earned $300 for that robbery, for being available with a possible getaway car. Wharton first got his chance when, while he was with Holt, Reynolds called to announce a plan to rob a marijuana grow house. During the robbery, Holt carried a gun and supplied one to Wharton. The robbery yielded trash bags of marijuana, which the participants split. On another occasion, Reynolds, Holt, and Wharton attempted to rob a Family Dollar store. When the teller failed to open the register, Holt hit her with his gun, and they left.

Ishmael Bowers, another participant in the robberies, testified that the robberies were committed with the Short North Posse, that Reynolds organized the robberies, and that Holt was an aggressor. Bowers described an incident in which he, Reynolds, Holt, and Wharton had broken into a house in the Short North neighborhood and had taken four ounces of cocaine, which they split among themselves. On another occasion, these four, along with one other, broke into a marijuana dealer's condominium and took electronics and marijuana. "Everybody grabbed what they wanted to grab and left." Later, Reynolds, Bowers, and Holt robbed that same drug dealer

again. Holt pulled his gun and took $2,500 in cash, the dealer's scarf, and his sunglasses. The three men split the money.

Quincy Battle, the victim in this case, was a marijuana dealer who lived on the east side of Columbus. In March 2010, Reynolds decided to rob Battle, using information from "[s]omeone on the inside" of Battle's operations. Reynolds recruited Bowers to participate, telling him that "he had a lick"—a robbery—"for 15 pounds of weed." Reynolds and Bowers scoped out Battle's house to "[w]atch[] his movements to see when is the best time to go in his house" and to learn "how much money he's making."

On March 24, Reynolds learned that Wharton wanted to buy marijuana and drove him to Battle's house to do so. Later that day, Reynolds, Holt, and another person returned with Wharton to Battle's house with a plan to rob Battle. Wharton posed as a customer. He handed over money and was waiting in the front room when Holt entered, his face covered and his gun raised, "telling everybody to get down." But Battle went for the gun. Wharton and Holt shot Battle and fled. Battle died shortly thereafter.

Battle's murder remained unsolved for years. Investigators eventually began to suspect Holt and obtained a subpoena commanding him to appear at the federal courthouse in Columbus for a DNA sample, fingerprints, and a photograph. On August 28, 2014, Holt arrived at the courthouse in a wheelchair.[1] Holt's girlfriend testified that Holt could propel the wheelchair himself but could not open doors on his own. At least one officer escorted Holt and his girlfriend to the U.S. Attorney's satellite office in the courthouse. His girlfriend testified that, upon arriving at the courthouse, Holt twice asked one of the men whether he needed a lawyer but was told that

---

[1] On July 30, 2010 (after the Battle murder), Holt was shot multiple times in the back, which resulted in his paralysis from the chest down.

investigators just wanted to ask him a couple of questions. An officer, however, disputed her claim that Holt inquired about whether he needed an attorney. Holt's girlfriend remained in the lobby of the satellite office while Holt was questioned.

A federal prosecutor, two federal law enforcement officers, and two Columbus Police Department detectives interviewed Holt, hoping that he would cooperate in their investigation of the Battle murder and other homicides.[2] Pursuant to the Columbus Police Department's policy, one of the detectives had brought a recording device to the interview, but he discovered that the battery was dead. No recording of the interview was made. One of the detectives wrote up a summary of the interview approximately ten business days after it had taken place. After the summary was completed and approved, he destroyed his notes.

At the beginning of the interview, the prosecutor told Holt "that the only thing [he would be] required to do is the photograph and a DNA," that he would be "free to leave after doing that," and that "[h]e c[ould] leave any time he want[ed] to." The prosecutor indicated to Holt that he might "ask him some questions" but said that Holt did not have to answer them, had "the right to remain silent," and could not "be compelled to say anything." He also told Holt that he had the right to an attorney. Holt was never restrained, nor did he indicate that he was uncomfortable or that he wanted to leave.

Early in the interview, Holt gave a partial confession: he admitted that he possessed the gun that matched shell casings found at the murder scene. He also indicated that he had done reconnaissance for the robbery. At that point, prosecutors told Holt to leave and said that "he need[ed] to get an attorney and talk to an attorney and tell the attorney the truth because he's not

---

[2] A second prosecutor "was up in the satellite [office] as well and did poke his head in at some point."

telling us the truth." Holt pulled his shirt over his head, "started rubbing his head and said, 'Okay, let's start over,'" at which point Holt told a second story and eventually a third. In this final version, Holt stated that he had gone to the house with Reynolds to commit a robbery but that he had not entered the house. The interview lasted approximately two hours.

Holt was later charged with murder in aid of racketeering, 18 U.S.C. § 1959(a)(1), and murder with a firearm during a drug trafficking crime, 18 U.S.C. § 924(j).[3] He filed a pretrial motion to suppress his statements to investigators, arguing that he had been subjected to custodial interrogation without full *Miranda* warnings. In addition to testimony from Holt's girlfriend, the district court heard testimony from the prosecutor and two police officers who had been present during the interview. The district court held that the interview was not custodial and denied Holt's motion to suppress. Holt renewed his motion at trial. The district court again denied the motion, although noting concern at the officers' failure to record the interview. The jury found Holt guilty on both counts, and Holt was sentenced to life in prison for murder in aid of racketeering with a consecutive sentence of 25 years' imprisonment for murder with a firearm during a drug trafficking crime. Holt brings this timely appeal.

II.

Holt first claims that the district court erred in determining that he was not in custody during questioning. We review the district court's factual findings for clear error and its legal conclusions de novo; whether Holt was in custody is a mixed question of fact and law that we review de novo. *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003). The police are required to give *Miranda* warnings "only where there has been such a restriction on a person's freedom as to render

---

[3] Holt was also charged with cocaine and firearm offenses in connection with conduct on a different date, but those charges were dismissed before trial.

him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). In making this assessment, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Mathiason*, 429 U.S. at 495); *see also Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (asking "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave[?]"). We look at the totality of the circumstances to determine whether the defendant was in custody. *Swanson*, 341 F.3d at 528. Relevant factors include:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police . . . [or] acquiesced to their requests to answer some questions.

*Id.* at 529 (alterations in original) (quoting *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000)).

Holt was not in custody when he was questioned. It is undisputed that Holt was not formally arrested or physically detained at any point before, during, or immediately after the interview. *See United States v. Panak*, 552 F.3d 462, 467 (6th Cir. 2009); *Swanson*, 341 F.3d at 530. Although Holt was wheelchair-bound, he could propel himself in his wheelchair and never asked to leave. *Cf. Panak*, 552 F.3d at 467; *Crossley*, 224 F.3d at 862. And, critically, the prosecutor immediately told Holt that he was not in custody, that all he had to do was have his photograph and DNA sample taken, and that after that was completed he was free to go. *See Howes v. Fields*, 565 U.S. 499, 517 (2012) ("Taking into account all of the circumstances of the questioning—including especially the undisputed fact that respondent was told that he was free to

end the questioning and to return to his cell—we hold that respondent was not in custody within the meaning of *Miranda*."). The prosecutor also advised Holt that he did not need to answer any questions. We have called this the "[m]ost important" factor to the custody analysis. *Swanson*, 341 F.3d at 530 ("Most important to our analysis, though, is that Swanson was explicitly told by [the officer] that he was not under arrest and that he did not have [t]o speak with him if he did not choose to."); *see Panak*, 552 F.3d at 467–68; *United States v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1998).

The other circumstances to which Holt points do not cause us to believe that a reasonable person, unrestrained and told he was free to go, would have felt his freedom restricted to "the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125. Holt points out that he was subpoenaed to appear at the U.S. Attorney's Office's satellite office in the courthouse. He does not dispute, however, that the subpoena ordered him only to provide his DNA and fingerprints and to have his photograph taken. *See United States v. Anglian*, 784 F.2d 765, 769 (6th Cir. 1986) (rejecting, based in part on the plain words of the subpoena, defendant's argument that he subjectively believed that the subpoena required him to make a statement). And while the location may have been intimidating, *Miranda* warnings are not required "simply because the questioning takes place in the station house" or other "coercive environment." *Mathiason*, 429 U.S. at 495; *see also Beheler*, 463 U.S. at 1125; *Mason v. Mitchell*, 320 F.3d 604, 632 (6th Cir. 2003).

Holt also argues that the continued questioning made the interview custodial. The length of Holt's interview—approximately two hours—supports his argument that he was in custody, but that fact is offset by others, including those discussed above. *See Fields*, 565 U.S. at 515; *see also Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) (noting that a two-hour interview weighed in favor of custody but did not overcome other countervailing factors). Although the officers

continued to question Holt after he gave his first version of the story, the prosecutor first had told

Holt to leave and that he "need[ed] to get an attorney and talk to an attorney and tell the attorney

the truth because he's not telling us the truth."[4]  At that point, Holt pulled his shirt over his head,

started rubbing his head, and then said "Okay, let's start over," before giving a second and then a

third version of the events.  A reasonable person who had just been told to leave and speak to an

attorney would believe that he was at liberty to terminate the questioning and leave.

Nor does the fact that the prosecutor and the officers had planned to question him transform

his interview into a custodial one.  *Stansbury v. California*, 511 U.S. 318, 325 (1994) (per curiam)

("Even a clear statement from an officer that the person under interrogation is a prime suspect is

not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the

police decide to make an arrest."); *see also Mathiason*, 429 U.S. at 495.  Rather:

> an officer's views concerning the nature of an interrogation, or beliefs concerning
> the potential culpability of the individual being questioned, may be one among
> many factors that bear upon the assessment whether that individual was in custody,
> but only if the officer's views or beliefs were somehow manifested to the individual
> under interrogation and would have affected how a reasonable person in that
> position would perceive his or her freedom to leave.

*Stansbury*, 511 U.S. at 325.  Here, although the prosecutor informed Holt that he was a target of

the investigation, he also explicitly informed Holt that he did not have to answer any questions and

was free to go.

Finally, Holt stresses the officers' failure to record the interview.  He claims that "[t]he

lack of a recording, as required by [Columbus Police Department policy], certainly works against

Mr. Holt's basic rights to fundamental fairness."  Without the recording, Holt argues, there was no

---

[4] Holt cites trial testimony in which a detective stated that he did not recall anyone telling Holt to get an attorney at that point in the questioning.  The district court, however, continued to credit the prosecutor's previous testimony.  That finding was not clearly erroneous.

"objective evidence" showing what occurred in the interview. "Only with that complete information," he reasons, could the district court have made "a meaningful determination of the custodial nature of this interrogation." As Holt concedes, however, the mere violation of police department policy is insufficient to require suppression of the interview. *United States v. Luck*, 852 F.3d 615, 623–24 (6th Cir. 2017). To the extent that Holt argues that the failure to record should be considered in assessing the credibility of the prosecutor's and the officers' recollections of the interview, the district court took account of the failure to record and nonetheless found the officials' testimony credible. We have no reason, reviewing only a cold record, to find that determination to be clearly erroneous.

Holt was not arrested or physically detained. He was told that he could leave at any time and that he did not need to answer any questions. Considering the totality of the circumstances, we hold that Holt was not in custody when he was questioned. The district court did not err in denying Holt's motion to suppress.

### III.

Holt next claims that there was insufficient evidence to sustain his conviction for murder in aid of racketeering. We review a sufficiency-of-the-evidence claim de novo and ask whether, viewing the evidence in the light most favorable to the government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see United States v. Taylor*, 800 F.3d 701, 711 (6th Cir. 2015). "'Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.' The jury may draw any reasonable inferences from direct, as well as circumstantial, proof." *United States v. Tocco*,

200 F.3d 401, 424 (6th Cir. 2000) (internal citation omitted) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)).

Holt was convicted of committing a violent crime in aid of racketeering (VICAR), specifically, murder. 18 U.S.C. § 1959(a)(1). An individual has committed a VICAR offense if he, "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from" or "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity," commits a crime of violence, including murder. 18 U.S.C. § 1959(a). Holt challenges the first of these elements, arguing that there was insufficient evidence that he participated in the Battle robbery (and ultimately in Battle's murder) with the requisite purpose.[5] We disagree and hold that a reasonable jury could conclude that Holt participated "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from" the Short North Posse.[6]

---

[5] Holt also challenges the government's failure to prove a non-element: a "pattern of racketeering." This is not an element of a VICAR offense, although it is an element of the related but distinct RICO offense, 18 U.S.C. § 1962. *See United States v. Odum*, 878 F.3d 508, 517–18 (6th Cir. 2017), *vacated on other grounds sub nom. Frazier v. United States*, No. 17-8381, 2018 WL 1640324 (mem.) (U.S. Oct. 9, 2018). Holt was not charged with or convicted of a RICO violation, and he made no argument why proof of a "pattern of racketeering" would be required to sustain a VICAR conviction. We note that the district court did not instruct the jury that the government had to prove a pattern of racketeering and that Holt did not object.

To the extent that Holt's argument might be read to claim instead that the government failed to prove that the Short North Posse "engaged in racketeering activity," his claim clearly fails. The parties stipulated that the Short North Posse and its associates were "an enterprise as defined by 18 U.S.C. § 1961(4)" and that the Short North Posse was a criminal organization "whose members and associates engaged in murders, attempted murders, drug trafficking, weapons trafficking, extortion, robbery, arson, and other crimes within the Southern District of Ohio." *See* 18 U.S.C. § 1961(1) (defining "racketeering activity" to include "any act or threat involving murder, . . . arson, robbery, bribery, [or] extortion").

[6] Because we find that there was sufficient evidence of this pecuniary purpose, we need not address whether there was also sufficient evidence of the position-based purpose. *See* 18 U.S.C. § 1959(a) ("for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity").

Holt concedes that Reynolds planned the Battle robbery and that Reynolds was a member of the Short North Posse. Holt does not dispute his own involvement in the Battle robbery and homicide. But he claims the robbery was not a Short North Posse robbery; instead, it was one of many side hustles that Reynolds engaged in as a freelance criminal. There was, however, sufficient evidence from which a rational jury could disagree. The parties stipulated that one of the purposes of the enterprise—"[t]he Short North Posse, including its members and associates"—was "[e]nriching its members and associates through, among other things, the commission of crimes involving . . . robbery . . . , burglary, theft, and breaking and entering." They also stipulated that robbery was a racketeering activity of the enterprise, that members of the gang's Cut Throat and Homicide Squad—including Reynolds—"specialized in murders and robberies of rival gangs, other drug dealers, and targets thought to have large sums of cash or firearms," and that gang members often recruited non-member associates to assist with the robberies. Reynolds, a member of the Short North Posse, organized some of these robberies and would often recruit non-gang members to assist in executing them. One of these individuals, Ishmael Bowers, described the robberies he and Holt had participated in as having been committed on behalf of the Short North Posse. Battle was a drug dealer outside of the Short North neighborhood. Given that the Short North Posse often engaged in robberies, particularly of other drug dealers, and given that one participant in the Battle robbery had characterized the robberies he committed with Reynolds as ones he committed with the Short North Posse, a rational jury could conclude that Reynolds, a member of the Short North Posse, organized the Battle robbery not as a freelancer but as a gang member. *See Tocco*, 200 F.3d at 424 (stating that evidence "need not remove every reasonable hypothesis except that of guilt" (quoting *Spearman*, 186 F.3d at 746)).

Having concluded that this was a Short North Posse robbery, a rational jury could also conclude that Holt participated in the robbery to gain something of pecuniary value from the gang. Witnesses testified that Holt had participated in other robberies with Reynolds in which Holt had received a cut of the proceeds. A rational jury could consider the evidence that Holt had previously engaged in robberies led by Reynolds in which the participants had split the proceeds and conclude that such was the arrangement when Holt agreed to Reynolds' plan to rob Battle. There was sufficient evidence from which a jury could conclude beyond a reasonable doubt that Holt participated in the robbery and ultimate murder of Battle "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a).

\* \* \*

Accordingly, we AFFIRM the district court's judgment.