846 F.2d 358
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert JONES, Jr., Defendant-Appellant.
 No. 87-1325.
 United States Court of Appeals, Sixth Circuit.
 Argued Jan. 12, 1988.
Decided May 4, 1988.
Rehearing and Rehearing En Banc Denied Aug. 23, 1988.
 
 Richard L. Lee, Jr. (argued), Midland, Mich. (Court-appointed), for defendant-appellant.
 James A. Brunson, Asst. U.S. Atty. (argued), Bay City, Mich., Patricia G. Blake, Asst. U.S. Atty., Detroit, Mich., for plaintiff-appellee.
 Before MERRITT and RYAN, Circuit Judges, and PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant-appellant Robert Jones, Jr., having been already convicted of a felony in February 1984, was convicted by a jury in February 1987 for illegal possession on October 17, 1986, of a firearm in violation of 18 U.S.C. Sec. 1202(a)(1) (now codified at 18 U.S.C. Sec. 922 (g)(1)). The issue on appeal is whether the district court's finding that Jones voluntarily consented to the warrantless search which produced the firearm is clearly erroneous. For the reasons stated below, we hold that Jones's consent was not voluntary. We accordingly reverse the judgment of conviction.
 
 
 2
 On October 17, 1986, as Debbie Jo Higgins and her teenage son, Joshua, were trying to start their car, Joshua observed a man carrying a long-barreled gun or rifle. Joshua thought that the man appeared to be angry or arguing with his female companion. Joshua saw the man place the firearm in the front seat of a green Buick. The man and woman then got into the car and drove away. Mrs. Higgins, alerted to these events by Joshua, wrote down the Buick's license plate number and then called police.
 
 
 3
 The Bay City (Michigan) Police Department put out a radio message describing the incident and indicating that the license number was issued to Robert Jones. Detective Lt. Gordon McAllister spotted the car. Because he was driving an unmarked car, he called for assistance from a marked police car. Two responded. All three police cars stopped Jones in such a manner that Jones's car was effectively blocked from leaving the scene. Jones got out of his car and asked what was wrong. Although there are some discrepancies among the testimonies as to what exactly was said, either Officer Gonyea or McAllister told Jones that police had received a report that he had a gun and was mad at someone. Jones responded that he did not have a gun and that police could look in the car, which they did. At that point McAllister noticed that Jones's female passenger was crying. According to McAllister's testimony, the woman, Jane Dufresne, told him that Jones did have a gun. When Jones was confronted with this information, Jones allegedly replied, "Well, I did have one earlier, but I just put it in the apartment." McAllister recalled that he then said, "Bob, I don't believe you're supposed to have a weapon because you're a convicted felon," and asked for the firearm. Jones said that police could have the gun which was back in his apartment. McAllister asked Jones to follow him in his car to the apartment. Dufresne rode over in McAllister's car. Officer Gonyea also followed in his police car.
 
 
 4
 Upon arriving at the apartment, Jones offered to get the firearm for the officers. They stated that they would rather have Dufresne retrieve it. Jones stayed outside by his car while the two officers and Dufresne walked to the apartment. When Dufresne remembered that Jones had the keys, Jones on request gave them to one of the officers who handed them to Dufresne who then opened the door. Dufresne could not find the firearm, which the officers reported to Jones. Jones then said he could show them where it was. Jones walked into the residence, to a closet, and showed officers a shotgun, which was not loaded. Dufresne later testified that she and Jones had obtained the shotgun from a friend that day to take to her father who was going deer hunting. The officers confiscated the shotgun, which formed the basis for Jones's subsequent arrest and indictment.
 
 
 5
 At no time did the police officers ever apprise Jones, who testified that he has not had even one day of any formal education and is illiterate, of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or of his right to refuse a search. Jones testified that he cooperated with police because he believed he was under arrest from the time his car was stopped and blocked by police. Nonetheless, the district court held that Jones voluntarily consented to the warrantless search for the gun and denied Jones's motion to suppress evidence of the gun.
 
 
 6
 In Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), it was held that "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Id. at 227, 93 S.Ct. at 2047-48. The burden of proving voluntary consent to a warrantless search is on the government. Id. at 222, 93 S.Ct. at 2045. Moreover, "consent must be proved by clear and positive testimony, and, to be voluntary it must be unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." United States v. Scott, 578 F.2d 1186, 1188-89 (6th Cir.), cert. denied, 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978). The district court's findings with regard to voluntariness will not be reversed unless clearly erroneous. Id. at 1189.
 
 
 7
 As the Court made clear in Schneckloth, no one single factor is determinative of voluntariness. 412 U.S. at 226, 93 S.Ct. at 2047. A careful consideration of all existing circumstances is necessary. Among the relevant circumstances to be scrutinized are the defendant's youth, lack of education or low intelligence, the lack of any warnings regarding the accused's constitutional rights, as well as evidence of duress or coercion, such as, deprivation of food or sleep and prolonged detention or questioning. Id. Although the defendant's knowledge of the right to refuse consent to a search is not required to establish voluntary consent, the Supreme Court stressed in Schneckloth that:
 
 
 8
 The traditional definition of voluntariness we accept today has always taken into account evidence of minimal schooling, low intelligence, and the lack of any effective warnings to a person of his rights; and the voluntariness of any statement taken under those conditions has been scrutinized to determine whether it was in fact voluntarily given.
 
 
 9
 Id. at 248, 93 S.Ct. at 2058.
 
 
 10
 In the case on appeal the district court found that Jones's consent was voluntary based on its view that Jones knew that, as a convicted felon, he was in "a pile of trouble" and therefore decided to cooperate with the police in the hope that the whole issue would go away. Although it is within the district court's province to determine credibility, the district court ignored factors under the Schneckloth guidelines which strongly suggest that Jones's consent was involuntary. The unrebutted testimony is that Jones has had no formal education. In addition, police admitted that they never apprised Jones at any point of his Miranda rights or of his right to refuse a search. Moreover, the initial stop and blocking of Jones's car by three police cars established a custodial atmosphere and coercive environment. Although Jones subsequently drove in his own car to his residence, it was at the direction of police, two of whom accompanied him in their own cars. Undoubtedly, the district court was influenced by the facts that Jones did retain some freedom of movement when police entered his residence to look for the gun and that Jones agreed to get the gun when Dufresne could not find it. However, these "voluntary" acts must be examined within the overall context and psychological impact of the entire sequence of events, which began with a dramatic stop by three police cars which blocked Jones's means of egress and then escorted him to the search after he was questioned without the benefit of Miranda warnings. Indeed, Jones testified at the suppression hearing that he thought he was under arrest and had to comply with the officers' requests from the moment he was stopped and blocked from leaving.
 
 As stated in Schneckloth:
 
 11
 In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.
 
 
 12
 412 U.S. at 229, 93 S.Ct. at 2049. See United States v. Hearn, 496 F.2d 236 (6th Cir.) (consent was involuntary despite defendant's freedom of movement and presence on his own property, his ready acquiescence to a suggested search, his leading the way to the search area, and receipt of Miranda rights when coercive factors were also present), cert. denied, 419 U.S. 1048, 95 S.Ct. 622, 42 L.Ed.2d 642 (1974).
 
 
 13
 The defendant's statements and actions which led to seizure of the gun in question also violated Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The facts in this case show that defendant was in custody when three police officers, in three separate police cars, lights flashing, surrounded Jones's car, blocking him from leaving the scene. At this point the police had deprived Jones of his "freedom of action" in a "significant way," and placed him in a custodial situation. Id. at 477, 86 S.Ct. at 1629; see also New York v. Quarles, 467 U.S. 649, 655, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550 (1984); California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983); Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). They therefore should have given him Miranda warnings. During this seizure, and in response to inquiries, Jones told the police that the gun was in his apartment.
 
 
 14
 Jones's liberty remained under restraint throughout the time period when he was escorted by two police cars back to the apartment, when police told him to stay in his car and took his car keys, and when he was in the apartment looking for the gun. During the search, Jones made inculpatory statements as described at trial by Detective McAllister:
 
 
 15
 A. I went back outside and told Mr. Jones that Jane Dufresne couldn't find the weapon. He said: well, it's in there. I'll get it for you. I said: I guess you'll have to.
 
 
 16
 Q. So you went back in [the apartment] with the Defendant?
 
 
 17
 A. Yes, he went in front of me, went through the door, and right straight back to a closet on the opposite side of the room that we were in.
 
 
 18
 Q. What happened there?
 
 
 19
 A. He said: there it is....
 
 
 20
 J.A. at 62-63 (Trial Trans. 2/18/87 at 95-96) (emphasis added); see also J.A. at 38 (Suppr. Hearing Trans. at 45).
 
 
 21
 The gun seized was a fruit of the inculpatory statement "there it is," made while Jones was in custody, made in response to police interrogation, and made without Jones ever hearing Miranda warnings. Thus under Miranda, the district court erred in admitting the gun into evidence at trial.
 
 
 22
 In light of the foregoing, we are of the firm conviction that the district court erred in determining that Jones's consent was voluntary and uncoerced. As such, it was error to permit evidence at trial of the gun derived from the constitutionally impermissible search[1] and questioning. We therefore set aside the conviction, and remand this case to the district court with instructions to either grant a new trial or dismiss the indictment.
 
 
 23
 RYAN, Circuit Judge (dissenting).
 
 
 24
 I must respectfully dissent from the conclusion that the defendant's consent to search his home was not voluntarily given.
 
 
 25
 The majority opinion does not persuasively demonstrate that the district court's finding of voluntariness was clearly erroneous. It demonstrates, at best, the majority's disageement with the district court's conclusions about the credibility of several of the witnesses who testified at the hearing on the motion to suppress.
 
 
 26
 I agree that the seminal case of Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), fixes the standard for determining the voluntariness of consent to a warrantless search. There, the Court stated:
 
 
 27
 The traditional definition of voluntariness we accept today has always taken into account evidence of minimal schooling, low intelligence, and the lack of any effective warnings to a person of his rights; and the voluntariness of any statement taken under those conditions has been scrutinized to determine whether it was in fact voluntarily given.
 
 
 28
 Schneckloth, 412 U.S. at 248, 93 S.Ct. at 2058.
 
 
 29
 Faithful to that guidance in Schneckloth, the majority focuses upon three factors in concluding that "the district court erred in determining that Jones' consent was voluntary and uncounseled." Those three factors are:
 
 
 30
 1. The investigating officers' failure to give Jones the Miranda warnings;
 
 
 31
 2. The "coercive" nature of the officers' investigative tactics; and
 
 
 32
 3. Jones' low intelligence and lack of schooling.
 
 
 33
 Before examining some of the record evidence relating to those three factors, I must respectfully take issue with the court's observation at mid-opinion that "the district court ignored factors under the Schneckloth guidelines which strongly suggest that Jones' consent was involuntary." My examination of the record, and particularly of the trial court's bench opinion denying the motion to suppress the gun as evidence, fails to reveal to me any basis at all for the court's conclusion that the trial court "ignored factors under the Schneckloth guidelines." Concededly, the trial court's bench opinion does not include any specific reference to the Schneckloth case by name. It reveals very clearly, however, the court's thorough understanding of the standards announced in Schneckloth; standards with which the very experienced trial judge is unquestionably familiar.
 
 
 34
 A careful look at the evidence relating to the three factors discussed by the majority reveals precisely why this court's view of the facts should yield to the district court's view, both of which turn entirely on the credibility of the witnesses who testified before the trial court.
 
 
 35
 The first factor addressed by the majority is the officers' failure to give Jones any Miranda warnings. The court states:
 
 
 36
 At no time did the police officers ever apprise Jones ... of his rights under Miranda or of his rights to refuse a search.
 
 
 37
 However, Officer Gonyea testified as follows:
 
 
 38
 I asked him [Jones] if he had a gun in the car with him. He said no. And the other officer took a look in the car and said: "I can't see anything."
 
 
 39
 * * *
 
 
 40
 The other officer determined there wasn't a gun in the car itself, in the passenger section of the car.
 
 
 41
 So Mr. Jones was standing around by the back left rear of the car, and I said to him, I said: "You know, you don't have to, and I'm not going to force you, but could we look in the trunk of your car?"
 
 
 42
 He said: "Sure, no problem."
 
 
 43
 I said: "You understand you don't have to let us do it now?"
 
 
 44
 He said: "No, no problem."
 
 
 45
 He walked over there, put the key in and opened the trunk up for us.
 
 
 46
 Officer Gonyea further testified that throughout the period at the scene of Jones' initial stop, Jones "always seemed very cooperative." While it is undisputed that the officer did not give Jones any Miranda warnings, Officer Gonyea's testimony contradicts the inference that the failure to give Jones Miranda warnings was a matter of any significance in obtaining Jones' consent to search the car. The testimony also contradicts the majority's conclusion that the police chose not to apprise Jones of his right to refuse a search of his car. Although knowledge of a right to refuse is relevant to a determination that one's consent was voluntarily given, it is not "the sine gua non of an effective consent to a search." United States v. Mendenhall, 446 U.S. 544, 558-59, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980).
 
 
 47
 When Jones, his friend, and the officers arrived at Jones' home, the officers did not repeat the advice that Jones did "not have to let" the officers conduct a search, this time, of Jones' home. But Jones had already manifested a rather clear attitude of cooperation with the officers and a willingness to consent to the search at the time of his initial stop. As will be noted again hereafter, the trial court made specific findings of fact explaining precisely why it concluded that Jones voluntarily chose to cooperate with the police officers whether or not he was in a "custodial environment" and given Miranda warnings at the time his vehicle was stopped by the three police cars. Moreover, even if the situation at the time Jones' car was stopped was indeed a "custodial environment," the foregoing testimony by Officer Gonyea demonstrates that even though Miranda warnings had not been given to Jones, he was adequately informed of his rights under the fourth amendment to refuse to consent to the search of the vehicle. He unequivocally consented to the car search and subsequently volunteered that the gun was at his apartment.
 
 
 48
 The second point which the majority opinion addresses is that Jones' consent was the product of a coercive police atmosphere. In my judgment, that conclusion is also unsupported by the record. The majority opinion notes that "Jones testified that he cooperated with the police because he believed he was under arrest from the time his car was stopped and blocked by police." Jones testified that:
 
 
 49
 I was under arrest ... I considered I was under arrest anytime the police stopped you.
 
 Jones also testified that:
 
 50
 They [the police] didn't tell me I was under arrest. I thought I was because they stopped me.
 
 
 51
 Whether Jones was "under arrest" when his vehicle was boxed in by three police cars is not, of course, per se determinative of whether he consented to the subsequent search of his residence. It is at most a factor relevant, albeit remotely, to the voluntariness of the consent later given.
 
 
 52
 After a careful review of the record on appeal, one is hard-pressed to find any substantial evidence of coercion. Jones, unaccompanied, drove his own car back to his home and, after arriving, volunteered to go in and got the gun himself. After the officers declined Jones' offer to get the gun himself, Jones remained outside his home, alone. Even if Jones was physically unable to freely leave the scene at his home, he was still there upon his own suggestion and could, if he wished, have revoked his consent to permit the officers to search the home at any time prior to surrendering the gun.
 
 
 53
 Finally, the court concludes that Jones' low intelligence and negligible schooling contributed to the involuntariness of his consent. While a defendant's intelligence is a relevant factor in determining whether his consent is freely given, Schneckloth, 412 U.S. at 248, 93 S.Ct. at 2058-59, this court should not be quick to ignore the distinction between a defendant's general intelligence and formal schooling and his familiarity, rooted in experience, with police practices. Jones has had ample first-hand experience in confronting the police. He has one murder conviction and two felony convictions for delivery of marijuana, and was on parole at the time of his arrest in this case. He was, to say the least, "street wise." The district court concluded as much:
 
 
 54
 I'm satisfied that he [Jones] was on the spot, he knew that--he had been seen with the gun, he knew that he was a convicted felon, he knew that they knew he was a convicted felon, and he was under some pressure, but the pressure was because of the trouble he was in, and not because of anything that the police did.
 
 
 55
 He decided that the best thing to do was to cooperate with the police and let them get the gun and hope that the issue would go away, because he knew he was in a pile of trouble.
 
 
 56
 (Emphasis added.)
 
 
 57
 The foregoing is not merely an idle observation by the trial court. It is a specific finding of fact, after a lengthy evidentiary hearing, that despite the presence of some arguable indicia of involuntariness, the actual consent to enter the house to find the gun was freely given for the reasons found by the district court. That finding, and those reasons, turn entirely upon the credibility of the witnesses who testified before the district court, particularly the credibility of the defendant Jones. It is a finding with which the majority opinion disagrees but it is not one that justifies the appellate conclusion that "the district court ignored factors under the Schneckloth guidelines."
 
 
 58
 On appeal, this court generally defers to the district court's credibility assessments unless clearly erroneous. See, e.g., United States v. Puglisi, 790 F.2d 240, 244 (2d Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986). The district court specifically found Jones' version of the facts lacking in credibility. Further, voluntariness is "a question of fact to be determined from the totality of the circumstances." Schneckloth, 412 U.S. at 227, 93 S.Ct. at 2048. The district court's conclusion that Jones' consent was voluntary, informed, and rational is "plausible in light of the record viewed in its entirety." Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). "When there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 1512.
 
 
 59
 Accordingly, I would affirm.
 
 
 
 [1]
 Although Dufresne did tell police that Jones had a gun, the government has never alleged that she gave her consent to a search of the apartment she and Jones shared. Hence, the possibility of a valid third party consent to the search pursuant to United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), does not arise