RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0250p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee*,

    *v.*

YANIER N. TELLEZ aka Yanier Tellez-Crespo,

        *Defendant-Appellant*.

No. 22-5902

Appeal from the United States District Court for the Eastern District of Tennessee at Greeneville.
No. 2:20-cr-00100-1—Clifton Leland Corker, District Judge.

Decided and Filed: November 17, 2023

Before: MOORE, READLER, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Joseph O. McAfee, MCAFEE & MCAFEE, PLLC, Greeneville, Tennessee, for Appellant. Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

    READLER, J., delivered the opinion of the court in which MURPHY, J., joined. MOORE, J. (pp. 10–15), delivered a separate dissenting opinion.

_____

## OPINION

_____

    CHAD A. READLER, Circuit Judge. During a routine traffic stop, Yanier Tellez handed his wallet to a police officer. The ensuing search of the wallet yielded altered gift cards containing stolen credit card information, leading to Tellez's indictment on conspiracy, bank fraud, and identity theft charges. Tellez sought to suppress that evidence on the grounds that he

did not voluntarily consent to the search.  When his efforts came up short, Tellez pleaded guilty, preserving his ability to raise the suppression issue on appeal.  He now does so, and he also challenges, in both procedural and substantive respects, the sentence imposed by the district court.  We affirm.

I.

A highway patrol officer observed Yanier Tellez drift out of his lane.  During the traffic stop that followed, the officer asked Tellez if he could search his car.  Tellez agreed and exited the vehicle.  When the officer finished the search, he asked Tellez, "Do you have your wallet?"  Tellez initially asked him to repeat the question but then began removing his billfold from his back pocket.  The officer said, "Let me see it for a moment."  Tellez handed over the wallet as the officer reached for it.  Inside, the officer discovered three Visa gift cards, each with five-digit numbers written on the back, which the officer believed was indicative of credit card fraud.

The officer asked Tellez if he could swipe the cards.  Tellez agreed.  As the officer prepared to swipe one of the cards, Tellez changed his mind and said, "I don't give you permission."  The officer nevertheless swiped the cards, and the numbers on the magnetic strips did not match the cards, indicating they had been altered.  The officer then arrested Tellez.

Tellez was indicted for conspiracy to defraud the United States, 18 U.S.C. § 371, bank fraud, 18 U.S.C. § 1344(2), and aggravated identity theft, 18 U.S.C. § 1028A(a)(1).  He moved to suppress all evidence derived from the search of his wallet on the grounds that he did not voluntarily consent to the search.  Notably, Tellez did not challenge the officer's decision to swipe the cards despite Tellez's apparent withdrawal of consent for that activity.  *Cf. United States v. Bah*, 794 F.3d 617, 630 (6th Cir. 2015) (holding that swiping a card is not a search under the Fourth Amendment).  After reviewing a video recording of the traffic stop and considering the officer's testimony, the district court denied Tellez's motion.  To the district court's eye, Tellez's gesture of handing over his wallet reflected his nonverbal, voluntary consent to a search.  Other relevant considerations, the court noted, included that Tellez maintained a cooperative demeanor, appeared to communicate effectively with the officer, was not threatened or coerced by the officer, had previously consented to a search of his vehicle, and

later consented to the officer scanning the gift cards and searching his phone. Following the denial of his motion, Tellez entered a guilty plea as to all charges conditioned on his ability to challenge the suppression ruling on appeal.

During the sentencing phase, Tellez objected to the intended loss calculations used to derive his Guidelines offense level. Tellez, all agree, was found with only three fraudulent gift cards. But he also possessed a thumb drive with information regarding 300 other debit and credit card accounts. The three cards found in Tellez's wallet had been used to spend or withdraw an average of $1,400 per card. So the probation office calculated the intended loss by multiplying the total number of accounts associated with Tellez's scheme—303—by what it believed to be the average theft per account—$1,400. Rather than $1,400, Tellez argued the multiplier should be $500 per account, the figure used in calculating his co-conspirator's sentencing range, which, if adopted in Tellez's case, would have lowered his offense level by two. The district court agreed with the government and calculated the intended loss amount based on the $1,400 average loss figure.

Tellez also sought a downward variance from his Guidelines range based on a host of factors, including his acceptance of responsibility and a comparison to his co-conspirator's sentence. The district court rejected Tellez's request. Calculating Tellez's confinement range as 70 to 81 months, the district court sentenced Tellez to 70 months of total confinement.

II.

A. We begin with Tellez's request to suppress the evidence discovered from the search of his wallet. The Fourth Amendment establishes a right against "unreasonable searches and seizures." U.S. CONST. amend. IV. A person may waive this right, however, by freely and voluntarily consenting to a search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Lewis*, 81 F.4th 640, 652 (6th Cir. 2023). The district court concluded that Tellez so consented here, and on that basis denied his motion to suppress.

Whether Tellez's consent was given freely and voluntarily is "a question of fact to be determined from the totality of all the circumstances." *Bustamonte*, 412 U.S. at 227. "[O]ur review," accordingly, "is for clear error," *United States v. Carter*, 378 F.3d 584, 587 (6th Cir.

2004) (en banc), which requires a "definite and firm conviction that a mistake has been committed," *United States v. Loines*, 56 F.4th 1099, 1105 (6th Cir. 2023). In assessing whether a clear error occurred, we consider the evidence in the light most favorable to the government, the prevailing party. *Carter*, 378 F.3d at 587.

Numerous data points may inform a voluntariness inquiry. The analysis "is fact-specific, and there is no magic formula or equation for determining consent in the abstract." *Id.* at 588 (cleaned up). We thus look to factors such as "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *United States v. Blomquist*, 976 F.3d 755, 759 (6th Cir. 2020) (citation omitted). And consent, it bears adding, need not be verbal; it can be communicated through gestures or conduct. *Carter*, 378 F.3d at 587; *see also United States v. Hinojosa*, 606 F.3d 875, 882 (6th Cir. 2010).

We see no clear error in the district court finding that Tellez voluntarily consented to the search of his wallet when he handed it to the officer. Tellez acknowledges that he agreed to a search of his vehicle. Following the search, the officer asked Tellez if he had his wallet. Tellez indicated that he did, first by reaching for it, and then by handing the item over to the officer—telltale signs of a consented-to search. *Cf. Carter*, 378 F.3d at 588–89 (moving out of the way to allow an officer to search a room); *United States v. Thurman*, 525 F. App'x 401, 404 (6th Cir. 2013) (handing over car keys).

True, the officer's precise wording—"Let me see [the wallet] for a moment"—could, in some contexts, perhaps be viewed as a command. But in the circumstances here, it was not clear error for the district court to find otherwise. Consider the evidence before the court. Dashcam video of the encounter demonstrated that Tellez was calm and cooperative throughout the traffic stop. There was nothing coercive or threatening about the officer's actions. And the stop occurred during the day on a public street, lasting just fifteen minutes before Tellez turned over his wallet. That Tellez later tried to revoke his consent, if anything, demonstrates his appreciation of his right to refuse a police search to begin with. *See United States v. Mendenhall*,

446 U.S. 544, 558–59 (1980) (holding that knowledge of a right to refuse is "highly relevant to the determination that there had been consent").

Nor do we agree with Tellez that the question, "Do you have your wallet," and ensuing instruction, "Let me see it for a moment," failed to reflect the officer's intent to search the item. There is no particular script for seeking consent. *See United States v. Gant*, 112 F.3d 239, 243 (6th Cir. 1997) ("[A]ny words, when viewed in context, that objectively communicate to a reasonable individual that the officer is requesting permission to conduct a search constitute a valid search request." (cleaned up)). And the record here fairly demonstrates that the officer's question implied a request for consent. Tellez's own actions confirm the point. By reaching for his wallet and then holding it out towards the officer, Tellez demonstrated his understanding of the officer's desire to search the item. *See Carter*, 378 F.3d at 588–89. An understandable conclusion to reach, to be sure. Why else, after all, would the officer ask Tellez if he could see Tellez's wallet other than to express his interest in searching the item?

Tellez's reliance on *Harris v. Klare*, 902 F.3d 630 (6th Cir. 2018), is similarly unpersuasive, for two reasons. Start with the facts. In *Harris*, the subject of the alleged consent search was a teenager who was detained for over an hour, at night, surrounded by six police cars. *Id.* at 633, 639–41. During her conversation with the teenager, the officer touched her unclipped gun holster multiple times, which contributed to a coercive environment. *Id.* at 634. Additionally, there was no evidence the teenager understood her right to refuse a search. *Id.* at 640. That is far afield from Tellez's case—an adult stopped during daytime for roughly fifteen minutes who all agree consented to having his car searched before the officer asked to see his wallet. Second, the procedural posture in *Harris* was materially different. *Harris* was an appeal of a summary judgment order, so the question was whether a reasonable jury could find the plaintiff did not voluntarily consent. 902 F.3d at 634–35, 638. Here, on the other hand, we are reviewing only for clear error in the district court's assessment that Tellez freely and voluntarily consented to the search.

Nor are the dissenting opinion's cases worthy guides. In one, an officer asked to search the defendant's bag at the airport, to which the defendant replied, "[Y]ou've got the badge, I guess you can," a textbook example of acquiescing to authority. *United States v. Worley*, 193

F.3d 380, 383 (6th Cir. 1999).  In another, the officers falsely claimed they had a warrant before asking for consent.  *Bumper v. North Carolina*, 391 U.S. 543, 546–47 (1968).  And in each of the two remaining cases, the request for consent followed a Fourth Amendment violation, creating a sense of futility.  *See United States v. Haynes*, 301 F.3d 669, 683 (6th Cir. 2002); *United States v. Beauchamp*, 659 F.3d 560, 572 (6th Cir. 2011).  *But see also id.* at 575 (Kethledge, J., dissenting) (highlighting the majority opinion's failure to apply clear error review, instead opting to "sweep[] everything aside—the testimony, the findings, the concession, and with them all, surely, our standard of review"—to replace it all with the appeals court's own findings).  Tellez, on the other hand, was apprised of his right to refuse well before the search of his wallet, and no one has alleged a preceding Fourth Amendment violation.

Tellez's case is far more like *Gale v. O'Donohue*, 824 F. App'x 304 (6th Cir. 2020), another case he relied upon in his brief.  During a pat-down, an officer asked Gale, "Do you mind if I – do you mind if we check [for identification]?"  *Id.* at 307.  Gale responded, "Absolutely."  *Id.*  Gale argued that he intended to say, "Absolutely not," but that the officers moved too quickly.  *Id.* at 320.  Nonetheless, the district court held that Gale voluntarily consented, relying on facts similar to those here: (1) Gale was calm and cooperative, (2) the stop lasted approximately ten minutes, (3) Gale was an adult and showed no indications that he lacked the knowledge to consent, and (4) the officers did not use any coercive tactics.  *Id.* at 319–21.  We saw no clear error in the finding that Gale voluntarily consented to the search.  We reach the same conclusion here.

B.  With Tellez's conviction affirmed, we turn to his sentence.

1.  Tellez first contends that his sentence is procedurally unreasonable.  As the name suggests, procedural reasonableness concerns whether the district court used the proper procedures in deriving Tellez's sentence.  This includes calculating the sentencing range correctly, viewing the Guidelines range as advisory, considering the sentencing factors in 18 U.S.C. § 3553(a), refraining from considering impermissible factors, selecting a sentence based on facts that were not clearly erroneous, and explaining the rationale for the sentence.  *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).

Tellez asserts that the district court mistakenly used intended (rather than actual) loss in calculating his offense level. At sentencing, we note, Tellez argued that the amount of intended loss should be $500 per account, not $1,400. He did not make the point he makes now—that it was error to use the intended loss metric altogether. As this issue was forfeited in the district court, our review is confined to plain error. *United States v. Igboba*, 964 F.3d 501, 507–08 (6th Cir. 2020) (reviewing for plain error an appellate challenge to the loss calculation that was different from the loss-calculation objection at sentencing); *see also* Fed. R. Crim. P. 52(b).

That leaves a tall hill for Tellez to climb. Among other things, plain error requires demonstrating an error "that was obvious or clear." *United States v. Johns*, 65 F.4th 891, 893 (6th Cir. 2023) (citation omitted). And that is the case only if the error was so plain that the trial judge was "derelict in countenancing it." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (citation omitted). In other words, the error must be both "clear or obvious, rather than subject to reasonable dispute," *Puckett v. United States*, 556 U.S. 129, 135 (2009), as well as "clearly contrary to the law at the time of appeal," *Johnson v. United States*, 520 U.S. 461, 468 (1997).

Tellez's comes up well short of this high bar. Even assuming the district court erred by using intended loss to derive Tellez's sentencing range, any such error was neither obvious nor clear. Our existing precedent—as well as that of nearly every one of our sister circuits—states that "loss" within the context of U.S.S.G. § 2B1.1(b)(1) includes intended loss. *United States v. You*, 74 F.4th 378, 396–98 (6th Cir. 2023); *see, e.g.*, *United States v. Gadson*, 77 F.4th 16, 19–22 (1st Cir. 2023); *United States v. Lee*, 77 F.4th 565, 573–74 (7th Cir. 2023); *United States v. Verdeza*, 69 F.4th 780, 793 (11th Cir. 2023). The Third Circuit, we note, has held otherwise. *United States v. Banks*, 55 F.4th 246, 255–58 (3d Cir. 2022) (holding "loss" in U.S.S.G. § 2B1.1(b)(1) is limited to actual loss). But as out-of-circuit precedent, *Banks* does little to establish that the use of intended loss is "clearly contrary to the law [in this Circuit]." *Johnson*, 520 U.S. at 468. To be sure, this split of authority shows that reasonable debate exists on this question. *See United States v. Kennert*, No. 22-1998, 2023 WL 4977456, at *4–6 (6th Cir. Aug. 3, 2023) (Murphy, J., concurring). And it may be that, in the end, "loss" should not be read to

include "intended loss." *Id.* For today's purposes, however, it is enough to note that existing Sixth Circuit law forecloses Tellez's argument.

2. Tellez also raises a substantive reasonableness challenge. At bottom, that amounts to an assertion that the district court relied too heavily (or not heavily enough) on one or more of the 18 U.S.C. § 3553(a) sentencing factors in calculating a defendant's sentence. *Rayyan*, 885 F.3d at 442. But this too is no easy showing to make. After all, sentencing "is a matter of reasoned discretion," and our review is "highly deferential." *Id.*

Multiple factors weigh against Tellez's challenge. One, his sentence was within the Guidelines range (indeed, at the bottom), meaning we presume the sentence to be reasonable. *United States v. Christman*, 607 F.3d 1110, 1118 (6th Cir. 2010). Two, the district court thoughtfully considered the 18 U.S.C. § 3553(a) factors and the individual characteristics of Tellez and his offenses. In particular, the district court took account of (1) the seriousness of the offense, including the amount of intended loss, which was over a quarter of a million dollars; (2) the nature and circumstances of the offenses, "invasive" "fraud crime[s]" "accomplished by sophisticated means with a number of different victims"; (3) the need for general deterrence, especially with Tellez's crimes being difficult to investigate and prosecute; (4) Tellez's remorse and lack of criminal history; (5) Tellez's decision to plead guilty on the day of trial, albeit in light of late discovery disclosures by the United States; and (6) Tellez's personal history and characteristics. Based on these competing factors, the district court reasonably arrived at a sentence of 70 months, the bottom of the Guidelines range.

Tellez believes that he deserved a downward variance from his Guidelines range because of the district court's purportedly inflated calculation of intended loss. On that score, we note the district court's acknowledgement that its method for "calculat[ing] the loss might overstate the seriousness of [Tellez's] offense[s]." Yet even under the more conservative calculation proposed by Tellez, the court indicated that it would have awarded the same 70-month sentence. So it is difficult to see how the court "g[ave] an unreasonable amount of weight" to the amount of loss. *United States v. Moon*, 808 F.3d 1085, 1090 (6th Cir. 2015) (citation omitted).

Nor did the district court fail to pay sufficient heed to Tellez's guilty plea. Tellez received his acceptance of responsibility credit. He seems to believe even more relief was due. But the district court disagreed, in part on the basis that Tellez pleaded guilty at the last minute. That conclusion does not strike us as an abuse of discretion.

Lastly, we see no abuse of discretion tied to the purported disparity between the respective sentences imposed upon Tellez and his co-conspirator. The instruction in § 3553(a)(6) to avoid unwarranted sentence disparities "is not concerned with disparities between one individual's sentence and another individual's sentence," but rather national disparities. *United States v. Wells*, 55 F.4th 1086, 1094 (6th Cir. 2022) (citation omitted). When his contention is viewed through the proper lens, Tellez has identified no such disparity. Especially so when the sentence is within the Guidelines range, which itself aims to avoid such disparities. *United States v. Hymes*, 19 F.4th 928, 937 (6th Cir. 2021).

We affirm Tellez's conviction and sentence.

––––––––––––––––––

**DISSENT**

––––––––––––––––––

KAREN NELSON MOORE, Circuit Judge, dissenting.    The Fourth Amendment enshrines "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV.  This constitutional guarantee renders warrantless searches and seizures "*per se* unreasonable." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *United States v. Lewis*, 81 F.4th 640, 651 (6th Cir. 2023).  Voluntary consent to a search or seizure can render a warrantless search permissible, *Schneckloth*, 412 U.S. at 222–23, but the exception is "jealously and carefully drawn." *Jones v. United States*, 357 U.S. 493, 499 (1958).  Individuals must give this consent "unequivocally, specifically, and intelligently" for a warrantless search to surmount this constitutional hurdle. *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (quoting *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992)); *see also United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) ("Consent is voluntary when it is 'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion.'") (quoting *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008)).  We, along with the Supreme Court, have consistently held that mere acquiescence to a show of authority falls short of this demanding standard. *Worley*, 193 F.3d at 386; *United States v. Haynes*, 301 F.3d 669, 683 (6th Cir. 2002); *see also Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968) (stating that the burden of showing consent was voluntarily given "cannot be discharged by showing no more than acquiescence to a claim of lawful authority").  Because I would hold that, even under the clear-error standard of review, Yanier Tellez ("Tellez") did not provide free and unequivocal consent to Deputy Sheriff George Camacho ("Camacho") to search his wallet, as our precedent requires, I would reverse the district court's ruling on Tellez's Fourth Amendment claim.  I respectfully dissent.

Determining whether consent was freely given requires us to evaluate carefully "the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227.  Factors we look to in this determination include a "defendant's youth, lack of education or low intelligence, the lack of any warnings regarding the accused's constitutional rights, as well as evidence of duress or coercion,

such as . . . prolonged detention or questioning." *United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988) (per curiam).  A defendant's knowledge of their right to refuse to provide consent for a search is "not required to establish voluntary consent," *id.*, but we must "scrutinize[]" all factors, including "the lack of any effective warnings," when determining whether consent was voluntarily given, *id.* (quoting *Schneckloth*, 412 U.S. at 248).  No single factor is dispositive. *Id.*

The district court here concluded that the totality of the circumstances showed that Tellez voluntarily consented to Camacho searching his wallet.  In reaching this conclusion, it relied on the fact that during their interaction, Tellez had consented to let Camacho search his vehicle; and that after Camacho secured Tellez's wallet, Tellez gave, and then attempted to rescind, permission for Camacho to scan the Visa gift cards he found in Tellez's wallet.  *United States v. Tellez*, No. 2:20-CR-00100, 2022 WL 1073569, at *3–4 (E.D. Tenn. Apr. 8, 2022).  After "a careful scrutiny of all the surrounding circumstances," *Schneckloth*, 412 U.S. at 226, and keeping in mind that our precedent dictates that consent to a search must be given "unequivocally, specifically, and intelligently," *Haynes*, 301 F.3d at 682 (quoting *Tillman*, 963 F.2d at 143), I am left with the conviction that the district court clearly erred in its finding that Tellez had voluntarily consented to a search of his wallet.

During the suppression hearing, Camacho testified that he had asked for Tellez's consent to search the car, received an affirmative yes from Tellez, and reiterated and confirmed that he had Tellez's consent to search the car before doing so.  R. 89 (Suppression Hr'g Tr. at 15) (Page ID #484).  Later in the same hearing, Camacho testified during cross-examination that he had inquired about Tellez's wallet in the following interaction:

> Q:     Do you have your wallet is what you asked him; correct?
> A:     Yes.
> Q:     And he didn't repeat the question; did he?
> A:     He said, que.
> Q:     My what?
> A:     Yes.
> . . .
> Q:     So he says, yes, and he's reaching in his back rear pocket; correct?

. . .

Q: I'm not sure which pocket, but, yes.

. . .

Q: And so then you say, let me see it for a moment?

A: Correct.

Q: So you say let me see it for a moment prior to him giving it to you?

A: In the motion, grabbing his wallet.

. . .

Q: So at 16:02 [of the dashcam video] he's reaching for the wallet, and he says, sí; correct?

A: Yes.

(video playing)

Q: So the wallet is either mostly out of the pocket or perhaps out of the pocket, and you said, let me see it, but he hasn't handed it to you yet, right, according to the video here at 16:03?

A: No.

Q: Now, you were directing him to give you the wallet; right, that's what that means, let me see it?

A: Yes.

Q: Contrary to the way you got access to the car six minutes ago, you didn't say, do I have your permission to see your wallet; correct?

A: Correct.

*Id.* at 77–79 (Page ID #546–48).

In reaching its conclusion that Tellez provided voluntary consent for Camacho to search his wallet, the district court emphasized that Tellez had been asked for permission to search his car "immediately prior to" the request for his wallet, and "[i]n the same way." *Tellez*, 2022 WL 1073569, at *3. Based on Camacho's testimony, though, it is clearly erroneous to view these two interactions as sufficiently similar, such that Tellez should have been on notice that Camacho was requesting Tellez's permission to search the wallet's contents and that Tellez was free to refuse to hand over the wallet. When he wanted to search the car, Camacho explicitly asked Tellez if he could search the vehicle, and even reiterated that he had Tellez's consent prior to doing so. R. 89 (Suppression Hr'g Tr. at 15) (Page ID #484). Later, when asking about the

wallet, Camacho issued an imperative command for Tellez to "[L]et me see [the wallet] for a moment," at no point requesting Tellez's permission to hold the wallet or to search its contents, or even informing Tellez of his intent to do so. *Id.* at 77–79 (Page ID #546–48). Camacho himself agreed that his demanding to see the wallet was "contrary to the way" he had asked Tellez if he had consent to search Tellez's vehicle. *Id.* at 79 (Page ID #548). Given the disparity between the two interactions, the district court clearly erred in viewing Camacho's request for consent to search the car as indicating that Tellez should have interpreted Camacho's imperative demand for the wallet as a similar request. And we have consistently held that mere acquiescence to a show of authority, like Camacho's imperative command here, falls short of our demanding standard for establishing voluntary consent. *Worley*, 193 F.3d at 386; *Beauchamp*, 659 F.3d at 572.

The district court additionally viewed Tellez's consent for Camacho to scan the Visa gift cards after Camacho had rummaged through Tellez's wallet, followed by his attempt to revoke that consent, as "evinc[ing]" Tellez's knowledge of his right to refuse to provide consent when he handed over the wallet. *Tellez*, 2022 WL 1073569, at *4. This finding also relies on an incomplete reading of the record. First, although these two interactions occurred in close succession, Tellez attempted to rescind his permission for Camacho to scan the cards after Tellez both had already handed over the wallet in response to Camacho's imperative demand and had asked Camacho "[I]f [he] can do that" (i.e., scan the cards). R. 89 (Suppression Hr'g Tr. at 46) (Page ID #515). This sequence of events indicates Tellez may not have known about his right to consent when Camacho demanded to see his wallet. Second, even if Tellez's later attempt to withdraw consent to scan the gift cards does suggest that he knew about this right at the time he handed over the wallet, the record shows that Camacho explicitly asked for Tellez's permission to scan the gift cards, and that Tellez initially responded by telling Camacho to "go ahead" and scan the cards. *Id.* at 21 (Page ID #490). This exchange resembles Camacho's earlier request for consent to search the vehicle, but is entirely distinct from Camacho's compulsory command to "let me see" Tellez's wallet. If Tellez knew that he was free to refuse any request that Camacho made for consent to search—an important, but not dispositive, factor in this analysis, *see United States v. Mendenhall*, 446 U.S. 544, 558–59 (1980)—this knowledge is relevant only to the

extent that Camacho was making such a request.  With regards to the wallet, Camacho did not make a request but instead issued an imperative command.

The district court then stated that the rest of the factors—Tellez's cooperative demeanor and effective communication in Spanish with Camacho; the fact that the stop happened during daylight; the lack of any threat or coercion; the fact that Tellez was not physically restrained; and the length of time of the stop (roughly fifteen minutes at the point Camacho demanded Tellez's wallet)—supported its finding that Tellez voluntarily consented to his wallet being searched. *Tellez*, 2022 WL 1073569, at *4.  I agree that there is nothing in the record to indicate that Tellez was subject to threats or overt coercion, handcuffed at any point, or treated in a hostile manner. Fifteen minutes, though, is not an insignificant time for an individual to be pulled over, and a traffic stop like this is not an encounter that the reasonable person would feel free to terminate. *See United States v. Richardson*, 385 F.3d 625, 629–30 (6th Cir. 2004).  None of these other factors that the district court considered, furthermore, can cure a demand like Camacho's.  Based on my careful reading of the record, I am left with the firm conviction that Tellez was simply responding to a command issued by Camacho, rather than providing specific, unequivocal, and affirmative consent for Camacho to look through the wallet.

In affirming the district court's decision, the majority reiterates the district court's erroneous conclusion that Camacho telling Tellez to "[L]et me see [the wallet] for a moment" sufficiently reflected Camacho's intent to search the wallet.  Maj. Op. at 5.  In the cases that the majority cites to support this finding, however, the individual in question had *at least* been informed by the police of their intent to conduct a search.  *See United States v. Carter*, 378 F.3d 584, 587–88 (6th Cir. 2004) (en banc) (finding voluntary consent for a search when it was "undisputed" that an individual opened the door to their hotel room and "stepped back" after officers asked "if they could enter the hotel room and speak to him"); *Gale v. O'Donohue*, 824 F. App'x 304, 307 (6th Cir. 2020) (holding that an individual consented to a search after they affirmatively replied "Absolutely" to an officer asking "Do you mind if I—do you mind if we check [for identification]?").

In *Gale*, the unpublished opinion that the majority claims best parallels Tellez's case, Maj. Op. at 6, the police had not only explicitly asked for consent to search for identification but

also had received an affirmative "Absolutely" in response. *Gale*, 824 F. App'x at 307. This differs drastically from the situation at hand, where Tellez was given an imperative command to let Camacho see his wallet, was not informed that Camacho intended to search the wallet's contents, and had been explicitly asked for (and provided) consent for a different search of his vehicle in a significantly distinct manner earlier in this interaction. The majority's attempt to distance its decision here from our holdings in cases like *Worley*, *Haynes*, and *Beauchamp*, Maj. Op. at 5–6, ignores the fact that mere acquiescence to authority can, and does, occur in a number of different circumstances and manifest in myriad ways. The bigger issue at play, which the majority fails to recognize, is that once an officer has made a show of authority, like issuing the imperative command Camacho made here to show him the wallet, an individual cannot provide the voluntary consent the Constitution requires by simply complying. Our precedent demands more.

I believe that the district court clearly erred in ruling that, based on the full record, Tellez had unequivocally and specifically consented to a search of his wallet. He gave it to Camacho after Camacho issued a demand that Tellez "let [Camacho] see [the wallet] for a moment." In this context, where Camacho had explicitly asked Tellez for his consent to search his vehicle and, later on, where Camacho had explicitly asked Tellez for permission to scan the Visa gift cards, it cannot stand that Tellez unequivocally and specifically consented to a search of his wallet, as our precedent requires. Camacho himself agreed that he "command[ed]" Tellez to turn over the wallet, and that earlier, in contrast, he had requested Tellez's consent to search the vehicle in a dissimilar manner. Handing over an item for a police officer to search, after the officer has issued an imperative command for an individual to do so, is merely acquiescing to a show of authority. Because this has never been sufficient under our caselaw to establish voluntary consent, I would hold that the district court clearly erred, and REVERSE and REMAND. I respectfully dissent.